J-A21004-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| HOORFAR DENTAL GROUP - RICHBORO, LLC, MERSAD HOORFAR DMD | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| ALEXANDRA GATSCH, TERRY RAKAWSKY, DMD, RG DENTAL GROUP OF RICHBORO, LLC | : : : : | No. 2574 EDA 2021 |
| Appellants | : | |

Appeal from the Judgment Entered November 10, 2021
In the Court of Common Pleas of Bucks County Civil Division at No(s):
2019-00657

BEFORE:  LAZARUS, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.:                **FILED NOVEMBER 14, 2022**

Alexandra Gatsch, Terry Rakawsky, DMD, and RG Dental Group of Richboro, LLC (collectively, Defendants/Buyers) appeal from the judgment entered on a jury verdict in favor of Appellees', Hoorfar Dental Group-Richboro, LLC, and Mersad Hoorfar, DMD (collectively, Plaintiffs/Sellers), in this breach of contract action.   After careful, we affirm on the basis of the trial court opinion.

On June 14, 2018, Defendants entered into a written Asset Purchase Agreement (APA) to buy Plaintiffs' dental practice (Practice), located in Richboro, Bucks County, for a purchase price of $850,000.00.   The APA contained an integration clause memorializing that the "[APA] **and the existing exhibits** hereto contain the entire agreement between the parties

. . . [and that the APA] may not be modified, amended, altered, supplemented, or canceled[,] except pursuant to the terms of an instrument in writing signed by the parties hereto." APA Integration Clause, 6/14/18, at § 17.7 (emphasis added); *see also* N.T. Jury Trial, 7/13/21, at 28 (Defendants' attorney agreeing contract was "[f]ully integrated"). Defendants also bought the Practice's accounts receivables (Accounts Receivables), as of July 30, 2018, for an additional $78,080.00[1] (70% of the value of accounts less than 90 days old). The parties executed an amendment to the APA and a Promissory Note (Note) that documented the valuation of the Accounts Receivables. The amendment to the APA and the Note delineated that Defendants were to pay the $78,080.00 in twelve consecutive monthly installments of $6,506.66, without interest, beginning on August 31, 2018. In addition, pursuant to a Professional Services Agreement (PSA), Defendant, Mersad Hoorfar, DMD, agreed to work as an independent contractor for Plaintiff RG Dental Group for a minimum of three months following the sale of the Practice.

Defendants paid the purchase price, took over the Practice, including all dental tools, equipment, and supplies,[2] collected the Practice's Accounts

---

[1] The $78,080.00 did not include interest as long as Defendants did not default. In the event of a non-cured default, interest accrued on the Note at the rate of 10% per annum.

[2] The APA included the following provision regarding supplies:

> **SUPPLIES**: Supplies will continue to be purchased by the Seller and delivered to the Practice until the date of Closing at no cost

*(Footnote Continued Next Page)*

Receivables (that were billed prior to closing but not yet paid), and began operating RG Dental with Dr. Hoorfar[3] continuing to work for the agreed-upon three-month-period post-sale. Section 9 of the APA designated that the dental equipment was sold in "As-Is" condition. When Buyers found fault with the condition of the equipment and alleged that there was a shortage in stocking of supplies on hand prior to the time of the transfer of the Practice, Buyers ceased paying the monthly $6,505.66 installment as per the APA and Promissory Note and also deducted money owed under the PSA to make alleged "repairs" to dental equipment. N.T. Jury Trial, 7/13/21, at 145. In addition, Buyers failed to pay Dr. Hoorfar in full for his post-sale work and services that totaled approximately $10,360.50.

On January 31, 2019, Plaintiffs filed a complaint against Defendants alleging breach of contract-promissory note (Count I), breach of contract-professional service agreement (Count II), and invasion of privacy-appropriation of Plaintiff's Identity (Count III). Complaint, 1/31/19, at 3-5. Plaintiffs sought to enjoin Defendants from continuing to appropriate Plaintiff's identity or engage in any unfair or deceptive practices or fraudulent behavior, compensatory damages, the rendering of an accounting of billing and

---

to the [Buyer], such that the Seller shall maintain its normal supply inventory as maintained during the course of Seller's general operations.

APA, 6/14/18, at ¶ 4.

[3] RG Dental also hired Danielle Teitelman, DMD, who had worked for the Practice prior to its sale.

collection of Plaintiffs' professional services rendered, injunctive and equitable relief, as deemed proper by the court, reasonable attorneys' fees and costs, and pre- and post-judgment interest. *Id.* at 5-6.

On March 5, 2019, Defendants filed an answer with new matter and counterclaims for misrepresentation and breach of contract. Plaintiffs filed preliminary objections to Defendants' new matter and counterclaims, seeking dismissal of Defendants' pleading for lack of specificity and in the nature of a demurrer. *See* Pa.R.C.P. 1028(a)(3), (4). In their preliminary objections, Plaintiffs claimed that Defendants: (1) defaulted on the Note on November 30, 2019; (2) continue to be in default in the amount of $58,506.02, plus interest, attorneys' fees, and costs; and (3) only made partial payments under the PSA causing Defendants to suffer damages in excess of $10,000.00.

On May 13, 2019, the trial court granted Plaintiffs' preliminary objections, in part, and dismissed Defendants' counterclaim for misrepresentation. On June 7, 2021, Plaintiffs filed a motion *in limine* to preclude the admission of parol evidence to supplement the parties' written agreements. On July 13, 2021, the trial court held oral argument on Plaintiffs' motion *in limine* at which Plaintiffs argued that the language in the APA was not ambiguous and Defendants argued the APA's language "aggregate amount" with regard to the Accounts Receivable was susceptible of different,

but reasonable, interpretations.[4]  N.T. Jury Trial, 7/13/21, at 23, 32-33.  The court ultimately granted Plaintiffs' motion, concluding that the APA was not ambiguous and that the term "aggregate amount" means "total" amount.

A three-day jury trial was held before the Honorable Denise M. Bowman. Prior to the start of trial, Plaintiffs withdrew their invasion of privacy claim. N.T. Jury Trial, 7/13/21, at 5.  At the conclusion of trial, Plaintiffs made a motion to dismiss with regard to Accounts Receivable and any claim based on actual damages regarding two pieces of dental equipment.  N.T. Trial, 7/15/21, at 89-91.  The court denied the motion to dismiss with regard to the

_____

[4] Exhibit B, attached to the APA, included the following provision regarding Accounts Receivable, in relevant part:

> **ACCOUNTS RECEIVABLE**.  As of the Closing Date, Seller will provide Purchaser with a written [A]ccounts [R]eceivable aging report, in such detail as Purchaser may reasonably request, relating to any services provided by Seller to any patient prior to the Closing Date[.]  Purchaser shall purchase the Practice Accounts Receivable **for a price equal to the aggregate amount of such receivables that are no more than ninety (90) days old multiplied by Seventy Cents ($.70)**.  (By way of example:  if, as of the Closing Date, the aggregate amount of the Practice Accounts Receivable no more than ninety (90) days old is equal to One Hundred Thousand Dollars ($100,000.00), then Purchaser shall purchase such receivables for the price of $70,000 ($100,000 x $.70 = $70,000)).

APA, Exhibit B, 6/14/18, at 1.  Plaintiffs' counsel interpreted the term "aggregate amount" to mean the total amount "regardless of what insurance will actually pay," N.T. Jury Trial, 7/13/21, at 33, while Defendants' counsel interpreted the term to mean that amount that is collectible (i.e., what insurance pays).

equipment and granted the motion[5] with regard to Defendants' counterclaim for breach of contract relating to Accounts Receivable. The jury rendered a verdict in favor of Plaintiffs for $69,166.00—$58,806.00 (breach of Note) and $10,360.00 (material breach of PSA). *See* N.T. Jury Trial, 7/15/21, at 218-20.

On July 26, 2021, Defendants filed a post-trial motion seeking a new trial, which the trial court denied on November 5, 2021. On October 21, 2021, Plaintiffs filed a petition for interest, costs, and attorneys' fees. On November 9, 2021, the court granted Plaintiffs' petition awarding Plaintiffs $19,127.94 in pre-judgment interest ($17,302.14 for breach of Note and $1,825.80 for breach of PSA), and $7,655.00 in attorneys' fees and costs. On November 10, 2021, Plaintiffs filed a praecipe to enter judgment on the jury verdict; the verdict was reduced to judgment.[6]

Defendants filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Defendants raise the following issues for our consideration:

(1) Whether the trial court erred as a matter of law in sustaining the Buyers' preliminary objections in the nature of a demurrer to Count I of the Buyers' counterclaim for misrepresentation by way of its interlocutory order entered May 14, 2019.

---

[5] The court deemed this a "motion for directed verdict." N.T. Jury Trial, 7/15/21, at 94.

[6] The entire judgment totaled $95,948.94, representing the jury verdict, pre-judgment interest, and attorneys' fees and costs.

(2)   Whether, especially in light of its order entered May 14, 2019, the trial court erred as a matter of law in granting the Sellers' motion *in limine* filed June 7, 2021[,] based upon the parol evidence rule.[7]

(3)   Whether, setting aside its granting of the Buyer's motion *in limine*, the trial court abused its discretion and/or clearly erred as a matter of law in ruling that the accounts receivable report delivered to the Buyer at the closing on July 31, 2019[,] was not part of the parties' contract and in precluding the Buyer from introducing evidence and testimony on the question of whether the Seller breached the A[PA] in this regard.

(4)   Whether the trial court should have entered judgment as a matter of law for the Buyer on the Sellers' claims for breach of the professional services agreement and for $19,775.91 for the Buyer on its counterclaim against the Seller for breach of the A[PA] with regard to the payment of Dr. Teitelman's bonus for services rendered prior to July 31, 2018.

(5)   Whether, alternatively, the trial court should have granted the Buyers' request for a mistrial as to all issues when the

---

[7]

It is well established that under the law of contracts, in interpreting an agreement, the court must ascertain the intent of the parties. In cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

*Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) (citations omitted).

> Sellers' counsel [] stood up in open court before the jury, accused the undersigned of professional misconduct and demanded a mistrial.

Defendants' Brief, at 3.

After reviewing the parties' briefs on appeal, the certified record, and relevant case law, we rely upon Judge Bowman's well-crafted opinion to affirm the trial court's judgment entered on the verdict in favor of Plaintiffs. *See* Trial Court Opinion, 3/9/22, at 16-21 (court properly dismissed Defendants' counterclaim for misrepresentation under "gist of action" doctrine where contract claim cannot be recast as tort claim as Defendants failed to support counterclaim with anything other than parties' written agreements); *id.* at 21-25 (court properly granted Plaintiff's motion *in limine* based upon parol evidence rule where Defendants admitted APA contained integration clause regarding sale/purchase of Accounts Receivable, evidence did not demonstrate ambiguity in APA, Defendants' attorney admitted Defendants were not alleging mistake or misrepresentation, and Defendants never claimed APA ambiguous throughout discovery or sought additional information on what "aggregate amount" meant); *id.* at 25-30 (court properly concluded Accounts Receivable report not part of parties' contract and precluded Defendants from introducing evidence and testimony on whether Plaintiffs breached APA where emails Defendants sought to introduce violated court's prior ruling on motion *in limine* determining term "aggregate amount" was not ambiguous with regard to amount of "collectible" Accounts Receivable); *id.* at 59-62 (court properly ruled against Defendants on breach of contract claim

where there was "evidentiary discrepancy" regarding whether Dr. Hoorfar paid Dr. Teitelman bonus for work performed prior to July 31, 2018; it was within province of jury to credit Dr. Hoorfar's testimony over that of Ms. Gatsch); *id.* at 40-42 (court properly denied Defendants' request for mistrial regarding Plaintiffs' counsel's remarks where court immediately dismissed jury after remarks made, Defendants' counsel did not claim his clients were prejudiced by the comments, and counsel's remarks were ameliorated by court's carefully crafted curative jury instruction[8]).

Judgment affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 11/14/2022*

---

[8] *See* N.T. Jury Trial, 7/15/21, at 143-45.

*E-Filed* 10/31/2022 02:15 PM
*See Attached List*



## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
## CIVIL ACTION – LAW

HOORFAR DENTAL **GROUP**-RICHBORO, :
LLC, and MERSAD HOORFAR, DMD   :    No. 2019 - 00657
      :
       v.       :
      :    Superior Court No.: 2574 EDA 2021
ALEXANDRA GATSCH,       :
TERRY RAKAWSKY, DMD, and RG     :
DENTAL GROUP OF **RICHBORO,** LLC   :

## OPINION

### I.    INTRODUCTION:

Appellants, Alexandra Gatsch ("Ms. Gatsch"), Terry Rakawsky, DMD ("Dr. Rakawsky"), and RG Dental Group of Richboro, LLC ("RG Dental") (collectively, "Appellants"), have appealed this Court's Order entered November 5, 2021, denying Appellants' Motion for Post-Trial Relief ("Motion for Post-Trial Relief"), and this Court's Order entered November 9, 2021, granting Appellees' Petition for Interest, Costs and Fees ("Petition for Interest, Costs and Fees"). This Opinion is filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a). For the reasons set forth below, the undersigned respectfully submits that this appeal be **DISMISSED**.

### II.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND:

This case arises from the purchase and sale of a dental practice. On or about June 14, 2018, Appellees, Hoorfar Dental Group-Richboro, LLC ("Hoorfar Dental") and Mersad Hoorfar, DMD ("Dr. Hoorfar") (collectively, "Appellees"), entered into a written Asset Purchase Agreement with Dr. Rakawsky and Ms. Gatsch for the sale of certain assets belonging to Hoorfar Dental to an entity to be formed by Dr. Rakawsky and Ms. Gatsch ("APA").[1] The parties to the APA agreed that the closing date of the sale/purchase would occur on July 31, 2018 ("Closing Date"). *See*

---

[1] The entity that was eventually formed to purchase those assets is Appellant, RG Dental.

THIS ORDER/JUDGMENT WAS DOCKETED AND SENT ON 03/10/2022 PURSUANT TO PA. R. C. P. 236.

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

APA at ¶ 11. With respect to the purchase price for the assets, the parties to the APA agreed as follows.

> Seller hereby sells and Purchaser hereby purchases the Assets of the Practice of the Seller for a total consideration of Eight Hundred Fifty Thousand Dollars ($850,000.00) (referred to herein as the "Purchase Price") plus the value of the Practice Accounts Receivable as set forth on the attached Exhibit B. Purchaser shall assume none of the liabilities of the Practice, except as may be specifically stated herein.

*Id.* at ¶ 2.[2] Exhibit B attached to the APA provides:

> **ACCOUNTS RECEIVABLE.** As of the Closing Date, Seller will provide Purchaser with a written accounts receivable aging report, in such detail as Purchaser may reasonably request, relating to any services provided by Seller to any patient prior to the Closing Date (the "Practice Accounts Receivable"). Purchaser shall purchase the Practice Accounts Receivable for a price equal to the aggregate amount of such receivables that are no more than ninety (90) days old multiplied by Seventy Cents ($.70). (By way of example: if, as of the Closing Date, the aggregate amount of the Practice Accounts Receivable no more than ninety (90) days old is equal to One Hundred Thousand Dollars ($100,000.00), then Purchaser shall purchase such receivables for the price of $70,000 ($100,000 x $.70 = $70,000)). Seller shall grant to Purchaser a limited power of attorney to endorse checks, in payment of such Practice Accounts Receivable, made out to Seller and received by Purchaser after Closing. Seller covenants not to order forwarding of Seller's office mail for a period of six (6) months after Closing, Purchaser agreeing to be fully responsible to ensure that Seller's mail shall be forwarded to Seller at the address of Seller's choosing. After Closing, Seller shall promptly remit to Purchaser payment of any Practice Accounts Receivable received by Seller.

APA, Exhibit B.

Additionally, and with respect to any employees of Hoorfar Dental who became employees of RG Dental, the parties agreed that Hoorfar Dental would be responsible to pay all employee expenses, including wages or salaries, that accrued prior to the Closing Date. *See id.* at ¶ 16.1.

---

[2] Subject to certain warranties in the APA, the parties agreed that the "Assets of the Practice" would be sold in an "as-is" condition. *See id.* at ¶ 9.

2

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents. E-Filed by: Daniele Faino

From and after, the Closing Date, RG Dental would be responsible for all such employee expenses. *See id.* at ¶ 16.2.

On the Closing Date, and pursuant to Exhibit B attached to the APA, Dr. Hoorfar provided Appellants a written accounts receivable aging report identifying the aggregate amount of accounts receivable no more than ninety (90) days. That figured totaled $111,543.00. N.T. 7/13/21, at 100-01; N.T. 7/14/21, at 159. Although explicitly permitted to do so, Appellants did not request any further detail. *See* APA, Exhibit B; *see also* N.T. 7/13/21, at 24-27, 38.

Also at closing, Hoorfar Dental, Dr. Rakawsky and Ms. Gatsch executed an Amendment to Asset Purchase Agreement ("Amendment to APA") amending section 3(iv) of the APA in its entirety to read as follows: "In addition to the Purchase Price, the value of the Practice Accounts Receivable shall be paid by Purchaser to Seller in twelve equal monthly payments without interest pursuant to the terms of a Promissory Note in the form attached hereto as Exhibit F." Amendment to APA at 1. On that same date, RG Dental, through its members, Dr. Rakawsky and Ms. Gatsch, executed a Promissory Note ("Promissory Note") which provided that RG Dental would pay Hoorfar Dental the total sum of $78,080.00 in twelve equal monthly installments of $6,506.66, without interest, beginning August 31, 2018. *See id.*, Exhibit F. Dr. Rakawsky and Ms. Gatsch both personally guaranteed the Promissory Note. *See id.*

The parties also executed an Assignment and Assumption of Employment Agreement ("Assignment of Employment Agreement") pursuant to which the Employment Agreement of one of Hoorfar Dental's employees, Dr. Teitelman, was assigned to, and assumed by, RG Dental. Additionally, the parties executed the Professional Services Agreement ("PSA"), that was attached as Exhibit E to the APA. Pursuant to the PSA, the parties agreed that Dr. Hoorfar would provide

3

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

dental services for a minimum of three months after the Closing Date. *See id.,* Exhibit E. For

those services, the parties agreed that Dr. Hoorfar would be paid as follows:

> INDEPENDENT CONTRACTOR shall receive a fee equal to 40% of gross
> collections less 40% of lab fees associated therewith, payable monthly pursuant to
> Exhibit "E" hereto. Following the second (2nd) month of this Agreement,
> INDEPENDENT CONTRACTOR shall receive compensation based upon the prior
> month collections on the 15th of each month.

*See id.,* Exhibit E, ¶ 8.

> Lab: usually consist of but not limited to, all Lab charges from different labs for
> Crown & Bridges, Dentures, its abutments, and related restorative lab works.
> Chemotherapeutic material cost such as ARRESTIN or PERIOCHIP. Cost of
> mouth guard fabrication charges, TMJ appliance, Orthodontic appliance charges,
> implants, bone graft, membrane, botox, dysport, restylane, perlane, Invisalign and
> any other mutually agreed Specialty supply or arrangements.

*See id.,* Exhibit E, Exhibit E.

Importantly, both the APA and the PSA contained integration clauses. Paragraph 17.7 of

the APA provided as follows:

> Entire Agreement. This Agreement and the exhibits hereto contain the final and
> entire agreement between the parties and shall not be bound by any terms,
> conditions or representations not contained herein. Seller and Purchaser may take
> legal advice from their own attorney in connection with this transaction.

APA at ¶ 17.7. Paragraph 12 of the PSA provides:

> This Agreement supersedes any and all other Agreements, oral or written,
> between the parties hereto with respect to the matter contained herein and it shall
> not be modified except in writing and executed by the parties hereto. However,
> the liabilities, if any, of the INDEPENDENT CONTRACTOR under any earlier
> agreement shall continue to survive under this Agreement.

PSA at ¶ 12.

On January 31, 2019, six months after the Closing Date, Appellees filed a Verified

Complaint ("Complaint"). In that Complaint, Appellees included a claim for breach of the

Promissory Note (Count I), a claim for breach of the PSA (Count II), and a claim for Invasion of

4

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

Privacy (Count III). *See* Complaint, Counts I-III. With respect to the two contract claims, Appellees averred that Appellants breached the Promissory Note by failing to make payments to Appellees for the Practice Accounts Receivable and also breached the PSA by failing to pay Dr. Hoorfar for dental services provided subsequent to the Closing Date. *See id.,* Counts I and II.[3]

On March 5, 2019, Appellants filed an Answer with New Matter and Counterclaim ("Answer, New Matter and Counterclaim") in which Appellants asserted a counterclaim for Misrepresentation (Count I) and, in the alternative, a counterclaim for Breach of Contract (Count II). *See* Answer, New Matter and Counterclaim, Counts I and II. In their counterclaim for Misrepresentation, Appellants averred that Appellees had fraudulently induced Appellants to enter into the APA. *See id.,* Count I. In Count II, Appellants averred, in the alternative, that based upon the same conduct pleaded in support of the Misrepresentation counterclaim, Appellees committed multiple breaches of the APA. *See id.,* Count II. Specifically, Appellants averred that Appellees had breached the APA as follows: 1) through a purported misrepresentation regarding the value of the accounts receivable which Appellants had purchased for $78,080; 2) by failing to pay a bonus to one of Hoorfar Dental's former employees (Dr. Teitelman); and 3) violating provisions in the APA regarding the condition of the equipment and supplies sold to Appellants. *See id.* at 5-8.

On March 25, 2019, Appellees filed Preliminary Objections seeking dismissal of Appellants' pleading for lack of specificity and also dismissal of Count I on the grounds of legal insufficiency ("Preliminary Objections"). As to their demurrer to Count I, Appellees argued that Appellants' counterclaim for Misrepresentation was barred by the Gist of the Action Doctrine as well as on the grounds that any Fraud-in-the-Inducement claim would be barred by the Parol

---

[3] Appellees withdrew their Invasion of Privacy claim prior to trial so it will not be discussed herein.

5

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

E-Filed by: Daniele Faino

Evidence Rule. *See* Preliminary Objections at 11-15. On May 3, 2019, Appellants filed a response to the Preliminary Objections. On May 13, 2019, the Honorable Jeffrey G. Trauger entered an Order overruling the preliminary objection pursuant to Pa. R.C.P. No. 1028(a)(3), and sustaining the preliminary objection to Count I pursuant to Pa. R.C.P. No. 1028(a)(4) ("May 2019 Order"). On June 4, 2019, Appellees filed a Reply to New Matter and Answer to Count Two of the Counterclaim.

Thereafter, on October 5, 2020, an Agreed Case Management Order was entered by the Honorable Robert O. Baldi ("Agreed Case Management Order") setting February 28, 2021 as the deadline for the identification and exchange of all exhibits. On May 27, 2021, the Honorable Wallace H. Bateman, Jr., entered an Order scheduling the matter for trial during the July 6, 2021 to July 16, 2021 trial term ("Pre-Trial Order"). Additionally, Judge Bateman directed the parties to file Pre-Trial Memoranda within ten (10) days after entry of the Pre-Trial Order. *See* Pre-Trial Order. Judge Bateman further directed that pre-trial memoranda include, *inter alia*, a list of all exhibits which each party intended to introduce at trial. *See id.* Notably, the Pre-Trial Order also stated as follows: "Failure to comply with these procedures may result in the exclusion from trial evidence not disclosed at this time...." *Id.*

Appellees filed their Pre-Trial Memorandum on June 7, 2021. Appellants filed their Pre-Trial Memorandum the next day.

On June 7, 2021, Appellees filed a Motion *in Limine* to Preclude Evidence That Varies From the Terms of the Written Agreements Underlying the Sale of the Dental Practice ("Motion *in Limine*"). Pursuant to their Motion *in Limine*, Appellees sought an Order precluding Appellants from introducing any documents or testimony at trial that would vary, explain, or contradict the terms of the parties' written agreements. Appellees argued that the written agreements are

6

integrated, and thus, the Parol Evidence Rule precludes the introduction of any such evidence. *See* Motion *in Limine* at 1-4.

Appellants filed a response to the Motion *in Limine* on June 22, 2021 ("Response to Motion *in Limine*"). In their Response to Motion *in Limine*, Appellants argued that an exception to the Parol Evidence Rule applied because there is an ambiguity in the APA. *See* Response to *Motion in Limine* at 1-4. Specifically, Appellants argued that the term "the value of the Practice Accounts Receivable" in Exhibit B to the APA was susceptible to more than one reasonable interpretation and, therefore, constituted an ambiguous term. *See* Response to Motion *in Limine* at 2-4.

Trial on this matter ultimately was scheduled to begin on July 13, 2021. On that date, and prior to jury selection, the undersigned held oral argument on the Motion *in Limine*. Counsel for Appellees, Michael Burns ("Mr. Burns"), argued that the language at issue is not ambiguous, and further, that Appellants had conceded as much in discovery. In response, Counsel for Appellants, William T. Dudeck ("Mr. Dudeck"), argued that an ambiguity did exist because the parties had two different, but reasonable, interpretations of certain language in the APA. Mr. Dudeck identified the phrase which Appellants contended was ambiguous as: "for a price equal to the aggregate amount of such receivables that are no more than 90 days old multiplied by 70 cents." N.T. 7/13/21, at 23. A few minutes later, Mr. Dudeck advised the Court that it was the two words "aggregate amount" together that constituted the purported ambiguity. N.T. 7/13/21, at 32-33.

During oral argument, Mr. Dudeck made various concessions. He conceded that it was not Appellants' position that there was a mistake or fraud but only that an ambiguity existed. N.T. 7/13/21, at 27-28. Additionally, he conceded that the APA is integrated. N.T. 7/13/21, at 27-28. He also admitted that Ms. Gatsch knew, at the time she signed the APA, that the figure to be paid for the aggregate amount of accounts receivable was $78,080.00. N.T. 7/13/21, at 31. He further

7

agreed that after this amount was calculated pursuant to the formula in Exhibit E to the APA, Ms. Gatsch signed a Promissory Note in the amount of $78,080.00 for the "aggregate accounts receivable." N.T. 7/13/21, at 31. He further conceded that Appellants had the right under the APA to request additional detail after being provided a copy of the written accounts receivable aging report and that they failed to request such information. N.T. 7/13/21, at 38. Mr. Dudeck also conceded that he was not arguing any ambiguity in the Promissory Note itself. N.T. 7/13/21, at 31.

In support of his position, Mr. Dudeck argued that Ms. Gatsch and Appellees both had reasonable interpretations of the language at issue and, therefore, the Court was required to find an ambiguity.[4] Mr. Dudeck argued that Dr. Hoorfar interpreted "aggregate amount" to mean the total amount, and Ms. Gatsch interpreted this same language to mean the "aggregate amount" that is *collectible*. N.T. 7/13/21, at 23-24, 33-34. He claimed that "what happened was that she thought she was getting $111,000.00 of collectible receivables 0-90 for $78,000.00 as part of the overall receivables . . . ." N.T. 7/13/21, at 24. Mr. Dudeck argued that because both interpretations were reasonable, an ambiguity existed, and the Court should permit the introduction of evidence to support Ms. Gatsch's interpretation. N.T. 7/13/21, at 21-22, 32-33, 36.

The undersigned ultimately determined that the APA was not ambiguous and that the term "aggregate amount," meant just that - "aggregate" or "total" amount. The Court granted the Motion *in Limine* and directed that there would be no parol evidence introduced at trial. N.T. 7/13/21, at 40.

---

[4] Notably, there was no offer of proof from Mr. Dudeck during oral argument as to Dr. Rakawsky's interpretation of the language in the PSA. All of the representations being made related specifically to Ms. Gatsch's purported interpretation. As a result, there is no record as to how Dr. Rakawsky, also a member of RG Dental, interpreted the language at issue.

8

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

Subsequent to that ruling, a jury was selected and empaneled. Thereafter, the Court gave various additional instructions to the jury, including instructions regarding how the trial was expected to proceed. With respect to the notion of objections, the undersigned instructed the jury as follows: "The attorneys have the right and duty to make objections in order to make sure that only legally sufficient and relevant evidence is considered by you. So you should not penalize any of the litigating parties because their attorneys make objections." N.T. 7/13/21, at 76. The Court further explained to the jury what evidence is, and what types of things are not evidence, such as objections, statements, or arguments by counsel. N.T. 7/13/21, at 76-81.

Thereafter, Mr. Burns made his opening statement on behalf of the Appellees. Mr. Dudeck then began his opening statement.[5] Partway through that opening statement, Mr. Burns objected and the Court heard Counsel at side bar. The objection by Mr. Burns was that Mr. Dudeck was in violation of the Court's order granting the Motion *in Limine* by referencing in his opening statement certain evidence that in fact constituted parol evidence. The Court excused the jury and heard argument from both attorneys. Ultimately, the Court agreed that the evidence which Mr. Dudeck sought to reference in his opening statement was parol evidence. The jury was brought back into the courtroom. Mr. Dudeck then simply thanked the jury and sat down rather than continuing further with an opening statement.

Appellees then called Dr. Hoorfar as their first witness. During that testimony, Mr. Burns asked Dr. Hoorfar a question or two which raised a concern with the Court that Mr. Burns may be seeking to introduce evidence in violation of the Court's ruling on the Motion *in Limine*. The undersigned brought both attorneys to side bar and raised its concern. Mr. Burns assured the Court

---

[5] Counsel for Appellants and Counsel for Appellees stipulated that opening statements would not be taken down by the Court Reporter. N.T. 7/13/21, at 16.

9

he had no intention of violating the Court's ruling. After sidebar, Mr. Burns immediately moved on to a new topic with Dr. Hoorfar. N.T. 7/13/21, at 128-29. Counsel for Appellants made no comments during this sidebar exchange. N.T. 7/13/21, at 128-29. Thereafter, the testimony of Dr. Hoorfar continued and concluded late in the afternoon on day one of the trial.

On day two, Mr. Dudeck started his cross-examination of Dr. Hoorfar. Early on during that examination, Mr. Burns raised a relevance objection. The undersigned heard the attorneys at side bar. During this side bar, Mr. Dudeck advised he would withdraw his question. N.T. 7/14/21, at 31-32. Shortly thereafter, Mr. Burns raised another objection which the Court overruled. Notwithstanding this, Mr. Dudeck felt it appropriate to make the following statement in front of the jury: "Your Honor, I'd like to proceed without these constant stops with objections that are clearly not relevant and that are just meant to interrupt my flow. I think they should be addressed in re-direct." N.T. 7/14/21, at 34. The Court was once again required to take the attorneys to side bar. After hearing Mr. Dudeck on the issue he raised, and also Mr. Burns on his concern as to the impact that Mr. Dudeck's comments might have on the jury's perception of Mr. Burns, the Court advised that it would be giving the jury a further instruction. N.T. 7/14/21, at 36. The undersigned then went back on the record and advised the jury as follows:

> Ladies and gentlemen of the jury, as I instructed you yesterday, you are going to hear the attorneys make objections. And the purpose of those objections from the perspective of the attorney making the objection is to make sure that you only hear evidence that's admissible and appropriate. You are not to hold it against the attorneys who are making the objection. Both of them have the right to do that. They are advocating for their clients, and they want to assure that only admissible evidence is introduced. So I want to make you aware of that again. And by agreement, that statement that was just made by Mr. Dudeck will be stricken. Well, you are not to consider it. Okay? You are to disregard the last statement that he made. It is not evidence, and it's not to be considered by you. Consistent with what I told you earlier that the statements of lawyers are not evidence. Okay? All right. Mr. Dudeck? Go ahead.

N.T. 7/14/12, at 36-37.

10

Subsequent to the conclusion of the testimony of Dr. Hoorfar, Appellees rested their case. The jury was then excused and Mr. Dudeck moved for a compulsory nonsuit as to Appellees' claim for breach of the PSA. N.T. 7/14/21, at 79. The Court heard argument from both Counsel and then denied the motion. N.T. 7/14/21, at 79-82.

Thereafter, Appellants presented their defense to Appellees' breach of contract claims and also introduced evidence in support of their own breach of contract counterclaims. Appellants' called Ms. Gatsch as their first witness.

During Ms. Gatsch's direct examination, Ms. Gatsch testified that she understood that RG Dental was purchasing the accounts receivable for the formula set forth in Exhibit B to the APA. N.T. 7/14/21, at 103. Ms. Gatsch also provided extensive testimony regarding equipment and supplies that were purchased as part of the sale of the practice. *See* N.T. 7/14/21. Ms. Gatsch testified that she had to replace some supplies and also repair certain equipment. *See* N.T. 7/14/21.

With respect to Dr. Hoorfar's ongoing work at RG Dental, Ms. Gatsch testified that Dr. Hoorfar did provide services to patients for some days in September, all of October, all of November and half of December 2018. N.T. 7/14/21, at 109-10. She testified that the formula for his pay was 40 percent of his gross collections less 40 percent of lab. N.T. 7/14/21, at 109-10.

Throughout the direct examination of Ms. Gatsch, Mr. Dudeck asked questions which drew objections from Mr. Burns on the grounds that such questions sought the introduction of parol evidence. The Court entertained these objections at sidebar and repeatedly warned Mr. Dudeck of the Court's ruling on the Motion *in Limine*. Thereafter, Mr. Dudeck asked Ms. Gatsch if she tried to collect on the accounts receivable after the transaction had closed. N.T. 7/14/21, at 135. Mr. Burns made an objection which the Court sustained. N.T. 7/14/21, at 135. Notwithstanding having heard the Court's ruling on that objection, Mr. Dudeck then asked Ms. Gatsch whether she was

11

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

able to collect any amount near $78,080.00 on those receivables. N.T. 7/14/21, at 135-36. Once again, Mr. Burns objected, and this time moved for a mistrial. Specifically, Mr. Burns stated as follows: "Objection, Your Honor. Move to strike any testimony of Ms. Gatsch as this officer of the court is failing to follow the directives of this Court. And I would move for a mistrial, and I would move for a directed verdict in my client's favor." N.T. 7/14/21, at 136. The Court then immediately dismissed the jury. Subsequent to the jury exiting the courtroom, Mr. Burns immediately withdrew his request for a mistrial. In response, Mr. Dudeck took the position that the Court was now obligated to declare a mistrial, and he moved for a mistrial on behalf of the Appellants. N.T. 7/14/21, at 136. The Court denied Appellants' motion and gave a detailed curative instruction to the jury. N.T. 7/14/21, at 141, 143-147.

Ms. Gatsch's testimony continued, and upon its completion, Mr. Dudeck advised that Appellants rested. The jury was excused and Mr. Burns moved for a compulsory nonsuit on both of Appellants' breach of contract counterclaims. With respect to Appellants' counterclaim relating to the value of the accounts receivable, Mr. Burns argued that Appellants had failed to adduce sufficient evidence of a breach. N.T. 7/15/21, at 89-91. With respect to the counterclaim regarding equipment and supplies, Mr. Burns argued that Appellants also had not adduced sufficient evidence to make out a breach of contract claim. The Court granted the motion as to the counterclaim regarding the accounts receivable and denied the motion regarding the counterclaim relating to the equipment and supplies. N.T. 7/15/21, at 93-94.

Thereafter, the jury returned to the courtroom. Appellees then presented their defense to Appellants' counterclaim that Appellees had breached the APA relating to the equipment and supplies purchased by RG Dental and also Appellants' counterclaim relating to the bonus it paid

12

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

to Dr. Teitelman which Appellants claimed should have been paid by Hoorfar Dental. Thereafter, the attorneys made closing arguments and the Court charged the jury. *See* N.T. 7/15/21.

While the jury was deliberating, Mr. Burns and Mr. Dudeck confirmed on the record an agreement regarding the awarding of pre-judgment interest and attorney's fees. N.T. 7/15/21, at 216-18. Specifically, they agreed that the Court would hold a separate hearing to determine the amount of pre-judgment interest and/or attorney's fees to which any party was entitled based upon the jury's verdict. The parties also stipulated that to the extent the Court awarded any pre-judgment interest, the proper date for that interest to begin to accrue would be December 1, 2018. N.T. 7/15/21, at 216-18.

After deliberations, the jury returned with a verdict in favor of Appellees on their claim for breach of the Promissory Note and awarded damages in the amount of $58,806.00. The jury also entered a verdict in favor of Dr. Hoorfar for his claim of breach of the PSA and awarded damages of $10,360.00 on that claim. On Appellants' counterclaim for breach of contract relating to the bonus paid to Dr. Teitelman, the jury found against Appellants. Similarly, the jury found against the Appellants on their breach of contract counterclaim regarding monies expended to repair/replace equipment and supplies.

Thereafter, on July 26, 2021, Appellants filed a Motion for Post-Trial Relief ("Post-Trial Motion"). In that Post-Trial Motion, Appellants averred that the jury's verdict was against the weight of the evidence with respect to Appellees' claim for breach of the PSA, Appellants' counterclaim for breach of the APA regarding the equipment/supplies, and Appellants' counterclaim for breach of the APA regarding Dr. Teitelman's bonus. *See* Post-Trial Motion at 3. Appellants also requested a new trial based upon various other purported errors on the part of the Court. *See id.* at 4-5.

On October 21, 2021, Appellees filed their Petition for Interest, Costs and Fees pursuant to the parties' agreement that the Court, rather than the jury, would decide whether any party should be awarded interest, costs and/or attorneys' fees, and if applicable, the amount thereof. N.T. 7/13/21, at 62-65; *see also* N.T. 10/25/21, at 3-4. A hearing took place on October 25, 2021, regarding the Petition for Interest, Costs and Fees. On November 5, 2021, the Court entered an Order denying and dismissing Appellants' Post-Trial Motion. Furthermore, on November 9, 2021, the Court granted Appellees' Petition for Interest, Costs and Fees and issued a Decision. The Court awarded Appellees pre-judgment interest and attorneys' fees for a total molded award in favor of Appellees in the amount of $95,948.94. On November 10, 2021, the prothonotary entered judgment in favor of Appellees and against Appellants in the sum of $95, 948.94.

On December 10, 2021, a Notice of Appeal was filed by Appellants. On December 16, 2021, the Court entered an Order directing Appellants to file a Concise Statement of Errors Complained of on Appeal within twenty-one (21) days from the filing date of this Order. On January 7, 2022, Appellants filed [Appellants'] Concise Statement of Errors Complained of on Appeal ("Concise Statement").

III. **ISSUES RAISED ON APPEAL:**

Appellants raise 13 issues on appeal.[6] Those issues are set forth below, verbatim:

1. Because the Jury's Verdict was against the weight of the evidence on this issue, Defendants respectfully submit that Your Honorable Court should have entered judgment notwithstanding the Verdict in favor of RG Dental Group of Richboro, LLC and against Mersad Hoorfar, DMD on his claim for breach of the Professional Services Agreement.

2. Alternatively, because Mersad Hoorfar, DMD's evidence in regard to his claim for breach of the Professional Services Agreement was insufficient on this issue, Your Honorable Court should have

---

[6] These issues will be discussed in a different order below.

14

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

granted RG Dental Group of Richboro, LLC's motion for compulsory nonsuit on this claim at the close of Plaintiffs' case-in-chief.

3. Because the Jury's Verdict was against the weight of the evidence on this issue, Defendants respectfully submit that Your Honorable Court should have entered judgment notwithstanding the Verdict in favor of RG Dental Group of Richboro, LLC and Hoorfar Dental Group, LLC and Mersad Hoorfar, DMD for $11,500.00 on the Counterclaim claim for breach of the Asset Purchase Agreement with regard to the sale of the office equipment and/or supplies.

4. Because the Jury's Verdict was against the weight of the evidence on this issue, Defendants respectfully submit that Your Honorable Court should have entered judgment notwithstanding the Verdict in favor of RG Dental Group of Richboro, LLC and against Hoorfar Dental Group, LLC and Mersad Hoorfar, DMD for $19,775.91 on the Counterclaim for breach of the Asset Purchase Agreement with regard to the payment of Dr. Teitelman's bonus for services rendered prior to July 31, 2018.

5. Your Honorable Court should not have sustained Plaintiffs' Preliminary Objections to Count I of Defendants' Counterclaim by way of its interlocutory Order entered May 14, 2019.

6. Your Honorable Court should not have granted Plaintiffs' Motion *in Limine* filed June 7, 2021.

7. Your Honorable Court should not have admitted, over Defendants' objection, Exhibit P11 and any testimony thereon.

8. Setting aside the reversible error committed by Your Honorable Court in re Plaintiff's Motion *in Limine* as set forth in paragraph 5 of this Statement, *supra*, Your Honorable Court should not have barred Defendants from proffering evidence to demonstrate Plaintiffs' breach of the Asset Purchase Agreement with respect to the sale of the accounts receivable.

9. Your Honorable Court committed reversible error in ruling that the accounts receivable report delivered to RG Dental Group of Richboro, LLC at the closing on July 31, 2019 was *not* part of the parties' contract.

10. Your Honorable Court should have admitted Exhibit D16 and any testimony thereon.

15

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

11.    Your Honorable Court should not have granted, and should have removed, the compulsory nonsuit as to Defendants' claim for Plaintiffs' breach of the Asset Purchase Agreement.

12.    Your Honorable Court should not have denied Defendants' motion for a mistrial after opposing counsel's antics before the Jury in open court.

13.    Your Honorable Court should have instructed the Jury on Defendants' requested points for charge numbers 1 and 3.

## IV.    DISCUSSION:

### A.    The Trial Court Did Not Err or Abuse its Discretion When it Sustained Appellees' Preliminary Objection to Count I of Appellants' Counterclaim

Appellants claim that Judge Trauger erred when he sustained Appellees' preliminary objection to Appellants' counterclaim for Misrepresentation and dismissed that counterclaim as legally insufficient. Judge Trauger, however, properly dismissed Appellants' Misrepresentation counterclaim based upon the Gist of the Action Doctrine. The Gist of the Action Doctrine prevents an ordinary contract claim from being recast as a tort claim. *See Bruno v. Erie Ins. Co.*, 106 A.3d. 48, 68-69 (Pa. 2014) (explaining that the Gist of the Action Doctrine is concerned with whether the essential foundation for a lawsuit is based in tort or contract). In general terms, tort actions are based upon breaches of duties imposed by law as a matter of social policy, while contract actions are based on breaches of duties imposed by "mutual consensus agreements between particular individuals." *Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. 1992). Pennsylvania Courts have previously recognized four circumstances where the Gist of the Action Doctrine will properly bar a putative tort claim:

1. The Tort Claim arises solely from a contract between the parties;

2. The duties allegedly breached were created and grounded in the contract itself;

3. The liability stems from a contract; or

16

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

    4. The tort claim essentially duplicates a breach of contract claim or the
success of the tort claim is wholly dependent on the terms of a contract.

*See eToll Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 19-21 (Pa. Super. 2002) (holding that plaintiff's claims of fraudulent practices against the defendant were barred by the Gist of the Action Doctrine since they either arose from the performance of the contractual relationship, or were grounded therein, and, thus, "not so tangential to the parties' relationship so as to make fraud the gist of the action," but rather, "inextricably intertwined with the contract claims").

In this case, Appellants failed to plead any averments in support of their **Misrepresentation** counterclaim referencing a duty imposed upon Appellees as a matter of social policy. *See* Answer, New Matter and Counterclaim. The only source of the parties' relationship is the written contract between them. And in fact, all of the duties and obligations which Appellants pleaded in their Answer, New Matter and Counterclaim were owed to Appellants are based upon and grounded in those written agreements. *See id.*

For example, in Appellants' Answer, New Matter and Counterclaims, Appellants pleaded that "[a]s consideration in, of and for the Purchase Price paid for the Practice, Defendants have recently learned that prior to closing Plaintiffs misrepresented or failed to disclose . . . [t]he true nature of the accounts receivable upon which Plaintiffs make their claims for payment . . . ." *Id.* at 5-6. With respect to their counterclaim for Misrepresentation specifically, Appellants incorporated by reference the prior averments of their pleading and then pleaded as follows:

- Plaintiffs' above-stated pre-closing representations and/or non-disclosures were material to the sale of the accounts receivables.

- These representations were intentionally false, made with indifference as to whether they were true or false and/or should have been known to be false when made, was material in nature, and made with the intent to deceive and defraud the Defendants and to induce them to purchase the Practice's accounts receivable.

17

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

- Defendants justifiably relied upon Plaintiffs' misrepresentations and were induced thereby to purchase the accounts receivable at the price stated in the Agreement.

*Id.* at 7-8.

Given the absence of any averments by Appellants that Appellees breached a duty that is imposed as a matter of social policy and/or which falls outside the scope of the APA, the Gist of the Action Doctrine properly applied to bar Appellants' Misrepresentation counterclaim. Accordingly, Judge Trauger did not err in dismissing that claim as legally insufficient.

Additionally, this Misrepresentation counterclaim would properly be barred by the Parol Evidence Rule insofar as it constitutes a fraud-in-the-inducement claim relating to an integrated contract.

> Our Pennsylvania Supreme Court has explained the parol evidence rule as follows:
>
> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburg Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (citing to *Gianni v. Russell & Co.*, 126 A. 791, 792 (Pa. 1924)); *see also Scott v. Bryn Mawr Arms, Inc.*, 312 A.2d 592, 594 (Pa. 1973). Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract. *See Robert T. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973) (explaining that when a written contract is clear and unequivocal, its meaning must be determined by its contents alone).

Therefore, for the parol evidence rule to apply, there must be a writing that represents the "entire contract between the parties." *Gianni*, 126 A. at 792. An integration clause which states that a writing is meant to represent the parties' entire agreement is a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution. *See HCB Contractors v. Liberty Place Hotel Assoc.*, 652 A.2d 1278, 1280 (Pa. 1995); *see also Lenzi v. Hahnemann Univ.*, 664 A.2d 1375, 1379 (Pa. Super. Ct. 1995); *see also McGuire v. Schneider*, 534 A.2d 115, 117 (Pa. Super. 1987), *aff'd*, 534 A.2d 115 (Pa. 1988) (explaining that a contract is integrated if it represents a final and complete expression of the parties' agreement). "The effect of an integration clause is to make the parol evidence rule particularly applicable. Thus, the written contract, if unambiguous, must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, or other writings, are admissible to explain or vary the terms of the contract." *1726 Cherry St. Partnership v. Bell Atlantic Properties, Inc.*, 653 A.2d 663, 665 (Pa. Super. 1995), *appeal denied*, 664 A.2d 976 (Pa. 1995).

It is well-settled that fraud-in-the-inducement claims may be barred if the contract at issue is fully integrated. *See Blumenstock v. Gibson*, 811 A.2d 1029, 1035 (Pa. Super. 2002) ("[F]raud -in-the-inducement claims are commonly barred if the contract at issue is fully litigated"); *see e.g. Hart v. Arnold*, 884 A.2d 316, 340 (Pa. Super 2005) (holding that appellant's fraud-in-the inducement claim was barred where appellant signed an integrated contract containing terms arguably conflicting with the alleged fraudulent misrepresentation). The rationale for this rule of law is that a party cannot justifiably rely upon prior oral representations and then sign a contract containing terms that refute the alleged prior oral representations. *See Blumenstock*, 811 A.2d at 1036. Thus, when "prior fraudulent oral misrepresentations are alleged regarding a subject that

19

was specifically dealt with in a written contract, the party alleging such representations must, under the parol evidence rule, also aver that the representations were fraudulently or by accident or mistake omitted from the integrated written contact." *HCB Contractors*, 652 A.2d at 1279; *see also Yocca,* 854 A.2d at 437 n.26 (holding that where a contract is integrated, "parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, i.e., that an opposing party made false representations that induced the complaining party to agree to the contract"). "To require less would make a mockery of the parol evidence rule because all a party would have to do to avoid, modify or nullify [a contract] would be to aver that false representations were 'fraudulently' made." *Nicolella v. Palmer*, 248 A.2d 20, 23 (1968).

In this case, it is undisputed that the APA has an integration clause. *See* Complaint, Exhibit A, ¶ 17.7. Notably, Appellants did not deny in their Answer, New Matter and Counterclaim that Exhibit A attached to the Complaint is an integrated contract between them. *See* Answer, New Matter and Counterclaim at 2. Rather, in responding to that particular averment in the Complaint, Appellants merely clarify, consistent with the language in the APA, that Ms. Gatsch and Dr. Rakawsky entered into the APA as agents for "an entity to be formed and owned by [them]." *See id.* Additionally, Appellants themselves specifically make reference to the APA and provisions thereof in support of their own counterclaims. *See id.* at 5-8.

Further, as discussed above, the alleged misrepresentations on the part of Appellees which form the basis for Appellants' Misrepresentation counterclaim relate to a subject that was specifically addressed in the APA (sale/purchase of Hoorfar Dental's accounts receivable). Importantly, Appellants did not plead that specific language was omitted from the parties' integrated contract by mistake or through fraud. *See* Answer, New Matter and Counterclaim. Rather, Appellants only pleaded that they relied upon prior representations that they later claimed

20

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents. E-Filed by: Daniele Faino

turned out to be false. *See id.*, at 7-8. This is exactly the scenario contemplated by the Parol Evidence Rule. *See Blumenstock*, 811 A.2d at 1036 (explaining a party cannot justifiably rely upon prior oral representations and then sign a contract containing terms that refute the alleged prior oral representations). Accordingly, Appellants' fraud-in-the-inducement counterclaim also would have been properly dismissed by Judge Trauger.

**B.** **The Trial Court Did Not Err or Abuse its Discretion When it Granted Appellees' Motion *in Limine* and Barred the Introduction of Parol Evidence**

Next, Appellants contend that the Court erred and/or abused its discretion by granting Appellees' Motion *in Limine* because there was an ambiguity in the APA. One exception to the general rule is that parol evidence may be introduced to explain or clarify or resolve the ambiguity. *See Estate of Herr*, 161 A.2d 32, 34 (Pa. 1960); *see also Waldman v. Shoemaker*, 80 A.2d 776, 778 (Pa. 1951). There are two types of ambiguities which may permit the introduction of parol evidence - patent ambiguity and latent ambiguity. *See In re Estate of Schultheis*, 747 A.2d 918, 923 (Pa. Super. Ct. 2000). A patent ambiguity appears on the face of the document and is a result of defective or obscure language. *Id.* A latent ambiguity arises from collateral facts that make the meaning of a written document uncertain, although the language appears clear on the face of the contract. *Id.* To determine the existence of ambiguity, a court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980). The disagreement of the parties regarding the proper construction of an agreement, however, <u>does not alone</u> render an agreement ambiguous. *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (summarizing Pennsylvania contract law on latent ambiguity).

21

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents. E-Filed by: Daniele Faino

Additionally, Pennsylvania law makes clear that "a claim of latent ambiguity must be based on a 'contractual hook;' the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face." *Id.* at 96. "Furthermore, a proffered alternative meaning for the contractual hook must be reasonable; that is, it must be supported by contractual evidence that goes beyond the party's claim that the contractual hook has a certain meaning, and the interpretation cannot contradict the standard meaning of a term when the parties could have easily used another term to convey this contradictory meaning." *Id.* "A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." *Id.* at 93.

Here, there is no dispute that the APA is an integrated contract and was to represent the parties' entire agreement including as relating to the sale/purchase of the accounts receivable. Indeed, Appellants admitted this in their Response to Motion *in Limine* and Mr. Dudeck conceded this during oral argument. *See* Response to Motion *in Limine* at ¶ 9; *see also* N.T. 7/13/21, at 27-28. There also was no dispute that the *only* basis on which Appellants argued that the Parol Evidence Rule did not apply was a purported ambiguity in the APA. N.T. 7/13/21, at 28-33. In fact, Mr. Dudeck clarified on the record during oral argument that his client was <u>not</u> averring any type of mistake or misrepresentation.[7] N.T. 7/13/21, at 28-33.

Specifically, Mr. Dudeck argued that the following language in Exhibit B to the APA is ambiguous: "for a price equal to the aggregate amount of such receivables that are no more than

---

[7] Although notably, Appellants later sought to pursue a breach of contract counterclaim at trial based upon a purported misrepresentation relating to this same subject area of the APA (i.e., valuation of the accounts receivable). *See* Section IV(C), *infra.*

22

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

ninety (90) days old multiplied by seventy cents ($.70)." N.T. 7/13/21, at 23. He explained that after the Closing Date, Ms. Gatsch came to learn that the aggregate amount of accounts receivable "didn't account for all the insurance write offs." N.T. 7/13/21, at 24. In other words, her interpretation was that the "aggregate amount" meant "aggregate amount of what you can collect." N.T. 7/13/21, at 26. He argued that this was a reasonable interpretation as was Dr. Hoorfar's interpretation that "aggregate amount" simply meant the amount owed "regardless of what insurance would actually pay on it under the contract with the dental practice." N.T. 7/13/21, at 33. Mr. Dudeck reasoned that because both interpretations were reasonable, an ambiguity existed, and thus parol evidence could not be barred. This Court disagrees.

First, the Court notes Mr. Dudeck's representation that his client realized there were two different interpretations when she began to collect on the accounts receivable. Obviously, she was then aware of this purported difference when she filed her Answer, New Matter and Counterclaim. And yet, during discovery, she did not take the position that the APA was ambiguous. For example, as Mr. Burns pointed out during oral argument, in response to Appellees' Interrogatory No. 19, Appellants objected but also responded as follows: "By way of further response, Defendants do not claim that any material term of the parties' asset purchase agreement is ambiguous." N.T. 7/13/21, at 20 (emphasis added). Similarly, when asked at her deposition if there was any portion of any of the agreements that she believed was ambiguous, Ms. Gatsch testified as follows: "No." N.T. 7/13/21, at 20. In this regard, Ms. Gatsch has conceded that there is no ambiguity.

Additionally, Appellants failed to offer any objective evidence to support Ms. Gatsch's interpretation. Instead, all that was offered was her self-serving subjective interpretation of the

APA. Indeed, Appellants did not even provide an offer of proof as to Dr. Rakawsky's interpretation.

Furthermore, the interpretation offered by Ms. Gatsch is completely at odds with the plain meaning of the language at issue. Mr. Dudeck identified the purportedly ambiguous term to be "aggregate amount." N.T. 7/13/21, at 32-33. Webster's Dictionary defines aggregate as: "formed by adding to or more amount together: total." *See* Webster's Dictionary. Black's Law Dictionary defines the term aggregate as "composed of several." *See Aggregate*, BLACK'S LAW DICTIONARY 65 (6th ed. 1990). According to Mr. Dudeck, however, Ms. Gatsch interpreted this term, to mean essentially "aggregate amount that is collectible" or "aggregate amount taking into account that insurance companies were paying." N.T. 7/13/21, at 23-35. To accept such interpretations would require this Court to ignore the plain language of the APA and to add language that either party could have requested and included if they wanted to do so. Indeed, Dr. Hoorfar and Ms. Gatsch are sophisticated individuals. Ms. Gatsch and Dr. Hoorfar both testified at trial about their prior experiences with sales of dental practices. *See* N.T. 7/13/21, at 112-124; *see also* N.T. 7/14/21, at 93-97. And, in fact, Ms. Gatsch testified to her extensive experience in the dental field, including working for many years with a large DSO. N.T. 7/14/21, at 93-97; *see also* N.T. 7/15/21, at 32-33. Additionally, both Appellants and Appellees were represented by counsel during the negotiations and sale of this dental practice.

Moreover, Exhibit B to the PSA itself explicitly provided Appellants the opportunity to seek more detail upon receipt of the written accounts receivable aging report. *See* APA, Exhibit B. Mr. Dudeck conceded during oral argument, however, that his clients simply did not take advantage of this opportunity. N.T. 7/13/21, at 22-27.

24

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents. E-Filed by: Daniele Faino

Finally, it is important to note that ultimately Appellants signed a Promissory Note pursuant to which they agreed that the debt owed to Hoorfar Dental for the Practice Accounts Receivable was $78,080.00. *See* Amendment to APA, Exhibit F. Indeed, after the parties calculated the Practice Accounts Receivable pursuant to the agreed upon formula in Exhibit B to the APA based upon the information contained in the written accounts receivable aging report provided by Appellees to Appellants on the Closing Date, they came up with a figure of $78,080.00. That figure was then transferred to the Promissory Note which Appellants signed. And, notably, Appellants <u>did not</u> argue nor claim that there was any term in the Promissory Note that was ambiguous.

For all the forgoing reasons, Appellants did not demonstrate any ambiguity, patent or latent, in the APA (including Exhibit B attached thereto), regarding the calculation of the value of the Practice Accounts Receivable. Accordingly, the Court properly granted the Motion *in Limine*.

C. **The Trial Court Did Not Err or Abuse its Discretion When it Barred Appellants From Proffering Evidence Relating to Their Counterclaim for Breach of the Asset Purchase Agreement With Respect to the Sale of the Accounts Receivable**

Appellants also complain that the Court erred or abused its discretion when it precluded them from introducing certain documents and testimony at trial which they proffered as evidence of their breach of contract counterclaim relating to the accounts receivable. With respect to that particular counterclaim, Appellants sought to prove that Appellees had made a misrepresentation regarding the value of the Practice Accounts Receivable thereby breaching the APA.[8] During

---

[8] Interestingly, during oral argument on the Motion *in Limine*, Mr. Dudeck represented to the Court that there was neither a mistake nor fraud involved. N.T. 7/13/21, at 27-28.

25

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

Mr. Dudeck's opening statement, however, it became apparent that Appellants intended to prove this purported breach through the introduction of evidence that would vary, explain or contradict the terms of this integrated agreement. When Mr. Burns objected to Mr. Dudeck's reference to such evidence during his opening statement, the following exchange occurred at sidebar:

MR. DUDECK:   I am trying to tell the jury what the evidence will present in terms of the breach after the contract. I am not talking about any parol evidence in terms of any prior contemporaneous negotiations about what she thought the $78,000.00 represented. She paid $78,000.00 for accounts receivable that were supposed to be worth 111. And when she goes to collect on them, they are worth about 10 thousand. That's a breach, Your Honor.

COURT:   Hold on a second. What evidence do you intend to introduce to support that breach, that alleged breach?

MR. DUDECK:   Your Honor, Ms. Gatsch is going to testify. And she's going to authenticate emails to Dr. Hoorfar showing how many of those accounts receivable 0-90 days had to be written off, each one of those, because of the insurance contracts. That's the evidence of the breach.

COURT:   Well, are we not putting the rabbit in the hat? So you are going to introduce evidence to attempt – this is a question – to attempt to show the jury that the value that she got was something other than 78 thousand?

MR. DUDECK:   Exactly. It was something different, Your Honor. So now she's being asked to pay $78,000.00 for something that was only worth 10 because of the representations regarding it, and that has nothing to do with parol evidence. That's a breach.

COURT:   How are you going to introduce evidence regarding value if I have ruled that no parol evidence is coming in?

MR. DUDECK:   Because parol evidence is an effort to try to change the terms of the contract based upon prior or contemporaneous written or oral outside of the contract. We are not doing that. We are going to show that he said that the value was 111 but that when she actually went to collect on these, the value was far less because it included all of these. He didn't include all the insurance write-offs. So that's the breach, Your Honor, and that's after. That's not trying to change the contract.

26

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

COURT:          Hold on a second.  Does the contract say that the value is 111 or does the contract say that's the calculation of the aggregate accounts receivable?

MR. DUDECK:     It says it's the aggregate amount of the accounts receivable.

COURT:          So you are going to introduce evidence that that's not the aggregate amount?

MR. DUDECK:     Exactly, Your Honor.

N.T. 7/13/21, at 92-94.  Thereafter, the Court dismissed the jury and took a short break.  After the break and before the jury returned to the courtroom, the Court asked Mr. Dudeck to identify the specific evidence he sought to introduce at trial in support of this particular breach of contract theory.  Mr. Dudeck identified various emails between the parties – some exchanged prior to the Closing Date and some exchanged after the Closing Date.  All of the emails related to the accounts receivable.  N.T. 7/13/21, at 105-10.

Mr. Burns objected to the introduction of such evidence on the grounds that it constituted parol evidence and the Court had already ruled that all parol evidence was barred.  Mr. Dudeck again argued that he was not introducing the evidence to vary or alter the terms of the APA but in support of his breach of contract counterclaim regarding the accounts receivable, and specifically to prove a breach and damages flowing from that breach.  N.T. 7/13/21, at 105-10.

It is well settled that in order to prove a claim for breach of contract, a plaintiff must adduce evidence sufficient to establish, by a preponderance of the evidence, the following elements: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and, (3) resultant damages.  *See Kelly v. Carman Corp.*, 229 A.3d 634, 653 (Pa. Super. 2020).  It is also well settled that before a contract can be found, all of the essential elements of

27

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

the contract must exist. *See Cardinale v. R.E. Gas Dev. LLC*, 74 A.3d 136, 140 (Pa. Super. 2013) (citations omitted).

In this case, Mr. Dudeck sought to introduce evidence that would vary, explain and/or contradict the parties' integrated agreement under the guise of pursuing a breach of contract claim. Specifically, Appellants sought to prove that Appellees breached the PSA when they sold approximately $111,000.00 of accounts receivable for $78,080.00 and Ms. Gatsch was not able to collect on all of the accounts receivable and had to write off some amounts. In order for Appellants to establish a breach, however, they first needed to demonstrate to the jury that the parties actually had come to a meeting of the minds that Appellants would be sold approximately $111,000.00 worth of "collectible" accounts receivable for $78,080.00. The Court's ruling on the Motion *in Limine*, however, precluded the jury from being able to find such breach. In ruling on the Motion *in Limine*, the Court determined that the term "aggregate amount" was not ambiguous, meant that which is reflected by its plain language, and *did not* mean the aggregate amount of "collectible" accounts receivable. N.T. 7/13/21, at 38-40. Consequently, the evidence Appellants sought to introduce was not probative of any breach on the part of Appellees, and, thus irrelevant. *See* Pa.R.E. 401. Accordingly, the Court properly precluded Appellants from introducing it.

Furthermore, Appellants waived this claim of a misrepresentation as the basis for a breach during oral argument on the Motion *in Limine*. A review of the Answer, New Matter and Counterclaim reveals that this particular counterclaim is premised on a purported misrepresentation on the part of the Appellants regarding the value of the Practice Accounts Receivable. *See* Answer, New Matter and Counterclaim. Indeed, subsequent to pleading a claim for Misrepresentation (Count I), Appellants pleaded a Breach of Contract claim (in the

alternative), and in support of that claim, incorporated their prior averments and set forth only the following three additional averments:

- In the alternative, and to the extent that Plaintiffs' representations arise out of or are subsumed by the Agreement, Defendants plead this claim for breach of contract in the alternative to the claim for misrepresentation.

- Plaintiffs' conduct as aforesaid constituted material breaches of the Agreement.

- As a direct and proximate result of these material breaches, Defendants have suffered and, upon information and belief, will continue to suffer damages in excess of $50,000.00.

*Id.*, Count II. At trial, Mr. Dudeck represented that the breach was based upon a purported misrepresentation. First, in responding to the objection to comments made during Mr. Dudeck's opening statement, Mr. Dudeck at one point stated as follows: "This aggregate amount was a breach because it misrepresented the aggregate amount." N.T. 7/13/21, at 94. Mr. Dudeck confirmed this position during another sidebar which occurred during the direct testimony of Ms. Gatsch:[9]

| COURT: | How are they going to determine whether there was a misrepresentation? |
|---|---|
| MR. DUDECK: | Not misrepresentation, Your Honor, a breach. A breach. |
| COURT: | But you are trying through the lens of a breach to argue that what he gave her was inaccurate? Right? |
| MR. DUDECK: | Correct. |
| COURT: | Okay. But that's a misrepresentation. |
| MR. DUDECK: | Well, it could be that he was, yes, it's a misrepresentation. But it's a breach based on the misrepresentation. |

---

[9] The specific question asked by Mr. Dudeck of Ms. Gatsch which caused Mr. Burns to object and the Court to hold a sidebar was as follows: "What were you being represented in terms of the accounts receivables that you were purchasing? N.T. 7/14/21, at 117.

29

N.T. 7/14/21, at 120.

Importantly, however, earlier during oral argument on the Motion *in Limine*, Appellants, through Mr. Dudeck, had represented to the Court that they **did not** seek to introduce any evidence regarding the accounts receivables based upon any fraud, but rather, based solely upon a purported ambiguity in the APA. N.T. 7/13/21, at 27-28.[10] In this regard, Appellants also waived this argument that the evidence should come in to prove a "breach based on the misrepresentation." N.T. 7/14/21, at 120.

### D. The Trial Court Did Not Err or Abuse its Discretion When it Admitted Exhibit P11 and Any Testimony Thereon

Appellants further complain that the Court erred and/or abused its discretion when it admitted Exhibit P-11 into evidence. During the testimony of Dr. Hoorfar, Mr. Burns marked Exhibit P-11 for identification purposes and presented it to Dr. Hoorfar. Dr. Hoorfar identified Exhibit P-11 as an aging report he ran for the dental services that he had provided to RG Dental after the Closing Date. N.T. 7/13/21, at 148-49. Mr. Burns then moved Exhibit P-11 into evidence

---

[10] During oral argument, the following exchange occurred:

COURT: Is it your position that parol evidence should come in because there's a term in this contract that's ambiguous?

MR. DUDECK: Yes, Your Honor.

COURT: Is that the only basis or is it also your position that there was either a mistake and/or fraud involved?

MR. DUDECK: No, Your Honor.

COURT: So we are just talking about ambiguity?

MR. DUDECK: Yes, Your Honor.

N.T. 7/13/21, at 27-28.

30

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents. E-Filed by: Daniele Faino

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

and Mr. Dudeck objected. When asked for the basis of the objection, Mr. Dudeck advised that he had "several" objections. As a result, the Court asked the attorneys to come to sidebar. At sidebar, Mr. Dudeck advised that he objected on the grounds of relevance because the end date of the date range identified on the report (8/1/2018 – 6/3/2021) was several months after everyone agreed Dr. Hoorfar had stopped providing dental services to the patients of RG Dental. As of that time, however, Dr. Hoorfar had already testified as to the time period when he provided dental services. N.T. 7/13/21, at 129-31, 140-44. Further, Mr. Burns responded that the end date identified on the report was the date the report was generated and otherwise the report was the same as that which existed on the date Dr. Hoorfar left the office. N.T. 7/13/21, at 149. He further confirmed that his client would be testifying as to the period of time to which Exhibit P-11 applied as relating to the dates when he actually performed the services. 7/13/21, at 150.

Mr. Dudeck then identified his second relevance objection arguing that the document does not have any reference to labs and the agreement between the parties was that Dr. Hoorfar would be paid 40 gross collection receipts less 40 percent of labs. Mr. Dudeck also made a Best Evidence objection on the same grounds.

Relevance is a threshold consideration in determining the admissibility of evidence. *See* Pa.R.E. 401 (evidence is relevant if: a) it has any tendency to make a fact more or less probable than it would be without the evidence; and b) the fact is of consequence in determining the action). A trial court may, however, properly exclude evidence if its probative value is outweighed by the danger of unfair prejudice or confusion of or misleading the jury. *See* Pa.R.E. 403 (the court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence); *see also Vetter v. Miller*, 157 A.3d 943, 949 (Pa.

31

Super. 2018) (explaining that generally, for the purposes of this evidentiary rule, "prejudice" means an undue tendency to suggest a decision on an improper basis).

In this case, the undersigned properly determined that Exhibit P-11 was relevant to the counterclaim being asserted by Dr. Hoorfar against Appellants for their breach of the APA, and specifically, probative of their obligations to pay him for dental services to be provided to him consistent with ¶ 14 (Professional Service Agreement), and Exhibit E. The undersigned did not find that this probative value was outweighed by any risk of danger of unfair prejudice, or confusion or misleading of the jury. Indeed, just because there was no reference to any labs on the document did not mean that there were any labs actually associated with these particular services. In fact, at no point in time did any party introduce any evidence of any particular labs that would properly have been deducted from the 40 percent of gross collection receipts attributed to Dr. Hoorfar's dental services for which he was not paid.[11]

Furthermore, Dr. Hoorfar testified both before and after the admission of Exhibit P-11 that the document did not reference any labs or any deduction from the 40 percent of gross collection receipts attributed to the dental services he provided after the Closing Date. N.T. 7/14/21, at 69-71. Thus, the jury not only heard during the trial what the formula was that applied to calculate amounts to be paid to Dr. Hoorfar for dental services provided by him under the PSA, which document itself was admitted into evidence, but also heard from Dr. Hoorfar that Exhibit P-11 did not reference any labs or deduction of any amounts for labs. N.T. 7/14/21, at 69-71.

---

[11] As discussed, *infra*, Ms. Gatsch testified that she reduced her calculation of what was owed to Dr. Hoorfar for dental services provided by him by $1,961.20 in "lab fees." N.T. 7/15/21, at 28. However, Ms. Gatsch offered no evidence of the labs for which she calculated this figure (e.g., (mouth guard fabrication for patient X, implants for patient Y).

32

Moreover, to the extent that Appellants still believed there was any possible confusion on the part of the jury as to how the compensation for Dr. Hoorfar was to be calculated given the absence of any labs referenced on Exhibit P-11, this was something that Mr. Dudeck could easily address through the testimony of his client and/or on cross-examination of Dr. Hoorfar.

The admission of Exhibit P-11 also did not violate the Best Evidence Rule.

> [The Best Evidence] rule requires a party who seeks to prove a writing for the purpose of establishing its terms to produce the writing unless the nonfeasability of production is satisfactorily established. *Warren v. Mosites Construction Co.*, 253 Pa.Super. 395, 385 A.2d 397 (1978). Application of the rule is limited to those situations where the contents of the document are at issue and must be proved to make a case or provide a defense. *Mars v. Meadville Telephone Co.*, 344 Pa. 29, 23 A.2d 856 (1942); *Perry v. Ryback*, 302 Pa. 559, 153 A. 770 (1931); *Ragnar Benson, Inc. v. Bethel Mart Associates*, 308 Pa.Super. 405, 454 A.2d 599 (1982); *Warren v. Mosites Construction Co., supra.* Where the contents of a document are merely evidence of, rather than material to, issues in the case the rule is inapplicable. *Durkin v. Equine Clinics, Inc.*, 313 Pa.Super. 75, 459 A.2d 417 (1983).

*Hamill-Quinlan, Inc. v. Fisher*, 591 A.2d 309, 310 (Pa. Super. 1991)

Here, the document which is the Best Evidence of the agreement between Appellants and Dr. Hoorfar regarding the dental services he was to provide after the Closing Date and the formula by which his compensation was to be calculated is the APA and Exhibit E (the PSA). Prior to Exhibit P-11 being marked for identification, the APA, including Exhibit E, had already been marked and moved into evidence. *See* Exhibits P-2 and P-6. Thus, the Best Evidence Rule would not be implicated in this case insofar as the Best Evidence already had been admitted, and further, Exhibit P-11 was merely evidence of Dr. Hoorfar's claim for breach of the Professional Services Agreement. *See Hamill-Quinlan*, 591 A.3d at 310.

For all of the foregoing reasons, the Court properly overruled Appellants' objections and admitted Exhibit P-11.

33

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

**E.    The Trial Court Did Not Err or Abuse its Discretion When it Denied Appellants' Motion for Compulsory Nonsuit as to Appellees' Claim for Breach of the Professional Services Agreement**

Appellants also take issue with the Court's decision to deny their motion for compulsory nonsuit as to Appellees' claim for breach of the PSA. A motion for compulsory nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not adduced sufficient evidence to establish all of the elements necessary to maintain a cause of action. *See* Pa.R.C.P. No. 230.1. In deciding the motion, a court may consider only evidence introduced by the plaintiff and any evidence favorable to the plaintiff that has been introduced by any defendant prior to the close of the plaintiff's case. Additionally, a trial court must give the plaintiff the benefit of all reasonable inferences arising from the evidence presented and must resolve any conflict in favor of the plaintiff. *See id.*; *see also Bugosh v. Allen Refractories Co.*, 932 A.2d 901, 913 (Pa. Super. 2007) (citing *Rachlin v. Edmison*, 813 A.2d 862, 868 (Pa. Super. 2002) (*en banc*) (quoting *Parker v. Freilich*, 803 A.2d 738, 744 (Pa. Super. 2002), *appeal denied*, 573 Pa. 659, 820 A.2d 162 (Pa. 2003)). Importantly, "if the trial court denies the motion for compulsory nonsuit and the moving defendant proceeds with his/her defense, then the court's ruling is not appealable, and the issue must be renewed during the post-trial phase as a request for judgment n.o.v." *Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664, 668 (Pa. Super. 2007), *appeal denied*, 947 A.2d 737 (Pa. 2008).

In this case, at the close of Appellees' case-in-chief, Mr. Dudeck moved for a compulsory nonsuit on Dr. Hoorfar's claim that Appellants had breached the PSA when they failed to pay him for dental services provided after the Closing Date. N.T. 7/14/21, at 79. Both attorneys made argument and the undersigned denied the motion finding that there was sufficient evidence introduced for the claim to go to the jury.

34

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

Thereafter, Mr. Dudeck introduced evidence in defense of this and Appellees' other breach of contract claims and in support of Appellants' own breach of contract counterclaims. For example, in defense of Appellees' claim for breach of the PSA, Mr. Dudeck marked a copy of the PSA as Exhibit D-3, moved that document into evidence, and then proceeded to question Ms. Gatsch about its terms. N.T. 7/14/21, at 107. Mr. Dudeck also questioned Ms. Gatsch about how compensation for Dr. Hoorfar was to be calculated under the PSA. N.T. 7/14/21, at 109-10. Mr. Dudeck also marked a report showing the total collections brought in for Dr. Hoorfar's services after the Closing Date as Exhibit D-12, moved Exhibit D-12 into evidence, and after it was admitted, questioned Ms. Gatsch on that document. N.T. 7/15/21, at 25-26. Ms. Gatsch testified that she ran the report to "calculate Dr. Hoorfar's payroll." N.T. 7/15/21, at 27. She also testified as to how she came to the figure she agrees is owed to Dr. Hoorfar for his services under the PSA. N.T. 7/15/21, at 27-28.

Once Appellants decided to move forward with a defense on Dr. Hoorfar's claim for breach of the PSA, the Court's decision on Appellees' motion for compulsory nonsuit became moot. Therefore, it is not properly the subject of this appeal. *See Northeast Fence*, 933 A.2d at 668; *see also F.W. Wise Gas Co. v. Beech C.R. Co.*, 263 A.2d 313, 315 (Pa. 1970) (holding that where defendant chose to present a defense after court denied defendant's motion for nonsuit, the correctness of the court's ruling on the nonsuit became moot and the issue of whether the claim was properly submitted to the jury was not properly before the appellate court).

Also, even if Appellants had not presented a defense and this issue was properly before the Superior Court, it still lacks merit insofar as Appellees introduced sufficient evidence in their case-in-chief for this claim to go to the jury. For example, Dr. Hoorfar introduced evidence of the PSA between him and Appellees. *See* Exhibit P-2. He also testified to the following:

35

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

- He provided services under the PSA after the Closing Date.
- He provided those services for approximately three months until sometime in December 2018.
- At some point Appellees stopped paying him for those services.
- He was entitled to 40 percent of net collections and that he was able to access information to show him what that figure would be for which he was not paid.
- Exhibit P-11 was an aging report that he ran for the work he had done after the Closing Date.
- He calculated the amount owed to him for the services for which he was not paid under the PSA as $10,360.50.

N.T. 7/13/21, at 142, 145-48, 152.

Based upon the foregoing, Appellants made out a *prima facie* claim for breach of the PSA. Accordingly, the Court properly denied Appellants' motion for a compulsory nonsuit and permitted the claim to go to the jury.

**F.    The Trial Court Did Not Err or Abuse its Discretion When it Ruled that the Written Accounts Receivable Aging Report was Not Part of the Parties' Contract**

Appellants also complain that the Court committed error and/or abused its discretion when it ruled that the written accounts receivable aging report provided to Appellants on the Closing Date was not part of the parties' integrated contract. At the beginning of day two, in the context of discussing Appellees' proposed point for charge No. 2, Appellants took the position that the written accounts receivable aging report which was provided to Appellants at closing and used to calculate the $78,080.00 figure in the Promissory Note was actually part of the parties' contract. N.T. 7/14/21, at 4-10. Mr. Burns opposed this position and argued that it was another attempt by Appellants to introduce parol evidence. N.T. 7/14/21, at 8-10. Mr. Burns represented to the Court that the contract between the parties included only the APA, Amendment to APA, Promissory Note and the exhibits attached to those documents (including the signed PSA). N.T. 7/14/21, 90-91. The Court took the issue under advisement and gave Mr. Dudeck an opportunity

36

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

to present legal authority in support of his position that the document, which was not attached as an exhibit to any of the agreements signed by the parties, constituted part of the parties' contract. N.T. 7/14/21, at 9-10. In response to that offer, Mr. Dudeck later provided the Court with the case of *Estate of Sinclar v. Levin*, 38 Pa. D & C. 5th 319 (Phila. Ct. Com. Pl. 2014), *aff'd*, 122 A.3d 1127 (Pa. Super. 2015) and pointed the Court to the following language contained therein: "A written contract *may* consist of several signed and *unsigned writings* if one of the writings is signed and: 1) the signed writing is physically attached to the unsigned writing; 2) the signed writing refers explicitly to impliedly to the unsigned writing; or 3) based on examination of all the writings, the signed writing was signed with reference to the unsigned writings." *Estate of Sinclar*, 38 Pa. D. & C. 5th at 324 (emphasis added). While the authority provided by Mr. Dudeck is an accurate statement of the law, the Court found it did not apply in this case.

First, it is undisputed that the written accounts receivable aging report was not physically attached to any writing. Indeed, although the APA and the Amendment to APA had exhibits attached to them, this was not one of them.

Second, there is no signed writing between the parties which explicitly or impliedly refers to any unsigned writing between the parties. Although Exhibit B to the APA does reference that Hoorfar Dental would provide Appellants with "a written accounts receivable aging report," that document was not an "unsigned writing between the parties." Unlike in the *Sinclar* case, the document at issue is not an unsigned promissory note. Indeed, it was not an agreement, instrument, or for that matter, even an email between the parties. Rather, Exhibit B to the APA made reference only to a document that would be generated from software to show what the receivables were for a particular period of time. Furthermore, this particular document could not

37

and did not exist until July 31, 2018. Thus, it could not be referred to, explicitly or implicitly, in the APA.

Third, the APA was not signed with reference to an unsigned writing. Again, the document at issue was not a "writing" between the parties but merely a computer printout. And, again, it did not and could not exist until July 31, 2018. Consequently, the parties could not have relied upon or considered its contents when they signed the APA on June 14, 2018.

Moreover, accepting Appellants' position that the July 31, 2018 written accounts receivable aging report was part of the parties' contract would have required the Court to ignore the clear intent of the parties as evidenced by the written agreements between them. It is firmly settled that the intent of the parties to a written contract is contained in the writing itself. *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993), *appeal denied*, 637 A.2d 287 (1993). "It is the intention of the parties which is the ultimate guide, and, in order to ascertain that intention, the Court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement." *In re Estate of Quick*, 905 A.2d 471, 474-475 (2006) (quoting *Hindman v. Farren*, 44 A.2d 241, 242 (1994)) (emphasis omitted).

Here, the parties entered into the APA on June 14, 2018. The APA included an integration clause which states as follows: "This Agreement and the exhibits hereto contain the final and entire agreement between the parties and shall not be bound by any terms, conditions or representations not contained herein." *See* APA at ¶ 17.7. The APA also provided that the "Agreement may not be modified, amended, altered, supplemented, or canceled except pursuant to the terms of an instrument in writing signed by the parties hereto." *Id.* at ¶ 17.9.

38

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

Pursuant to ¶ 17.9, the parties did enter into and signed an Amendment to APA on July 31, 2018. That document made reference to the manner and method by which RG Dental was to pay Hoorfar Dental and Dr. Hoorfar for the Practice Accounts Receivable. *See* Exhibit P-4. It also explicitly referenced a Promissory Note to be signed by Appellants and stated that the form of that Promissory Note to be signed was attached as Exhibit F. *See id.* at ¶ 1. Notably, and notwithstanding that the written aged accounts receivable did exist as of July 31, 2018 and was provided to Appellants on that date, and the Amendment to the APA was not signed until that date, the Amendment to APA makes no reference whatsoever to the written accounts receivable aging report. Certainly, if the parties wanted to include that document as part of the contract after it was generated on July 31, 2018, they could have referred to it in the Amendment to the APA and/or even just attached a copy of it to the Amendment to APA as an exhibit. They chose not to do so. *See* Exhibit P-4.

Moreover, the Court finds it notable that Appellants only took this position *after* the Court granted the Motion *in Limine*. Notably, there was no indication of this position in the Answer, New Matter and Counterclaim. *See* Answer, New Matter and Counterclaim. Appellees did not attach the written accounts receivable aging report to its pleadings or plead that it was part of the parties' contract. *See id.* Similarly, this position was not referenced anywhere in the Response to the Motion *in Limine*. It also was not raised during oral argument as a reason why this particular document should be permitted to be introduced at trial.

Based upon the foregoing, it was clear to the Court that that the parties did not intend for the written accounts receivable aging report to be part of their integrated contract. Accordingly, the Court did not err or abuse its discretion when it determined that the contract did not include it.

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

**G.      The Trial Court Did Not Err or Abuse its Discretion when it Denied Appellants' Motion for Mistrial**

Appellants next contend that the Court erred or abused its discretion when it did not grant

Mr. Dudeck's motion for a mistrial. A mistrial may be required where counsel makes "irrelevant

remarks ... which are reasonably likely to have a direct and prejudicial effect on the award of

damages." *Narciso v. Mauch Chunk Twp.* 87 A.2d 233, 235 (Pa. 1952); *Buttaccio v. American*

*Premier Underwriters, Inc.*, 175 A.3d 311, 321-22 (Pa. Super. 2017). However, to warrant a

mistrial, such remarks must be beyond correction by any admonition which the court may give the

jury. *See Tedesco v. Mun. Auth. of Hazle Twp.*, 799 A.2d 931 (Pa. Commw. Ct. 2002) (explaining

that mistrial is required where remarks are beyond correction by an admonition which the Court

may give the jury); *see also Ferguson v. Morton*, 84 A.3d 715, 724-26 (Pa. Super. 2013) (reversing

grant of new trial where trial court had taken prompt curative action with respect to counsel's

improper statements and jury verdict was supported by the evidence and not excessive).

In this case, the remarks made by Mr. Burns which Appellants now contend required the

undersigned to declare a mistrial occurred during the direct examination of Ms. Gatsch, and after

Mr. Dudeck asked a series of questions to which Mr. Burns objected based upon the Court's ruling

on the Motion *in Limine*. N.T. 7/14/21, at 136. As referenced above, the Court immediately

dismissed the jury before Mr. Burns could say anything further or Mr. Dudeck could respond to

Mr. Burns' remarks. As soon as the jury was out of the courtroom, Mr. Burns immediately

withdrew his request. Mr. Dudeck, however, argued that the trial had to stop. Specifically, he

stated:

> He made that motion. It's now told to the jury. We don't have —
> we are not here in a trial that is basically being done in a manner
> that's supposed to be done. They have that in their head now. You
> can't unring that bell. We are done. I'm sorry. It stinks that he said
> that, but that's where we are.

40

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

N.T. 7/14/21, at 136. Notably, Mr. Dudeck did not raise any specific argument that his clients were prejudiced or could be prejudiced by Mr. Burns' comments or his request for a mistrial. Rather, he argued only that it was the fact of Mr. Burns having requested a mistrial in the presence of the jury as the basis for his request. N.T. 7/14/21, at 136.

Furthermore, in light of the circumstances and the record which existed up until that point in time, a mistrial was not necessary insofar as the remarks were not beyond correction by a curative instruction to the jury. Also, the Court carefully considered the circumstances in crafting its curative instruction. The undersigned considered, *inter alia*, how the trial had proceeded up until that point in time, the frequency and nature of the comments made by each of the attorneys, and the prior instructions that had been given to the jury.

For example, in this case, although Mr. Burns objected on several occasions, he had not previously made any comments similar to these in front of the jury. Additionally, the Court already had instructed the jury multiple times that comments made by lawyers are not evidence and not something to be considered when coming to a verdict. The Court considered that **both** attorneys had regularly and repeatedly asserted objections throughout the trial and also that Mr. Burns' comments were made out of frustration with Mr. Dudeck's repeated attempts to introduce parol evidence. Based upon all of these considerations, the Court gave the following instruction immediately upon the jury's return to the courtroom:

> Before I dismissed you, Mr. Burns made some statements and a request. And I want to direct you that you are to disregard them in their entirety. You are not to consider them at all. Just like anything else that an attorney says, like an objection or an argument or an opening statement, that is not evidence. So you are not to take into consideration anything that was said by him before you were immediately dismissed. It has nothing to do with whether one party or the other breached a contract. And in this case, both parties are

41

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

alleging that the other breached a contract. So I want to make very clear my directive to you. You are to disregard those statements in their entirety. For a few reasons. The first is because it's not evidence. It shouldn't be considered by you in considering the parties' claims. Secondly, I want to make clear that Mr. Burns immediately withdrew those requests and statements after you left the room. That's on the record. You just weren't here. Additionally, and as you probably already observed, litigation can be stressful and emotions can run high at times. And sometimes emotions can make the attorneys act like they are under stress. And I think you have seen that from both sides today. Now, I also want to make sure that you recall my earlier instructions about objections. Again, objections are not evidence. Questions that's asked itself. Those are not evidence. It's the answer to the question. And, of course, when there is an answer to a question, then you have to take the question into consideration in determining how to evaluate the answer, obviously. You have to put it into context. But when questions are asked and there's an objection and I sustain that objection, then you are not to consider the question either. And if someone started to answer that question, you are to disregard the answer because I sustained the objection. Both attorneys have made objections throughout this trial. And as I explained earlier, they have jobs to do. They are advocates for their clients. They also have the job of making sure, from their perspective, only appropriate admissible evidence is presented to you. And the way for them to prevent evidence they don't believe is admissible to be presented to you is to make an objection. So you are not to hold against either party or their lawyers the fact that they are making objections.

N.T. 7/14/21, at 143-45. The Court also then went on to give the jury a detailed instruction on the Parol Evidence Rule.

Based upon the record before it, the immediate action taken by the Court was appropriate and sufficient to address the situation. Accordingly, the Court did not err or abuse its discretion in denying Mr. Dudeck's motion for a mistrial.

### H. The Trial Court Did Not Err or Abuse its Discretion When it Did Not Admit Exhibit D-16

Appellants also take issue with the Court's decision not to admit Exhibit D-16 into evidence. During the direct testimony of Ms. Gatsch on day two of the trial, Mr. Dudeck identified as Exhibit

42

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

D-16 a document he sought to show to this witness. N.T. 7/14/21, at 208. That document was an estimate to replace a panoramic x-ray machine for $23,000.00. N.T. 7/14/21, at 211. Mr. Burns immediately objected. N.T. 7/14/21, at 208. Given that it was late in the afternoon, the undersigned chose to dismiss the jury for the day and then address the objection with counsel outside its presence. N.T. 7/14/21, at 208-09. After the jury was excused, the Court heard Mr. Burns on his objection to Exhibit D-16. Mr. Burns argued that the document was not admissible because it was merely an estimate (as compared to an invoice), was dated July 4, 2021, just produced to Appellees, and not previously disclosed in Appellants' pre-trial memorandum. He also objected on the grounds of relevance arguing that replacement of the equipment was not an appropriate remedy under the parties' contract. N.T. 7/14/21, at 210-11.

In response, Mr. Dudeck argued that he only just received the document on July 4, 2021. Mr. Dudeck agreed that it was only an estimate and also that the piece of equipment which it referenced had not actually been replaced to date. N.T. 7/14/21, at 212. He argued, however, that he believed it was appropriate for the jury to consider for purposes of calculating damages. N.T. 7/14/21, at 211-13.[12]

The Court took the matter under advisement and offered Mr. Dudeck an opportunity to provide the Court with legal authority which substantiated his position that the estimate could be properly considered for purposes of calculating damages even though it did not evidence any actual costs incurred. N.T. 7/14/21, at 213. The next day, the Court heard further argument. Mr. Burns reminded the Court of the untimely submission of the document in violation of the pre-trial order

---

[12] Just minutes earlier, and with respect to the packet of documents making up Exhibit D-15, Mr. Dudeck was in agreement to remove one of the documents contained therein because it was an estimate and not an actual invoice. N.T. 7/14/21, at 190-208.

43

and also that because it was not exchanged in discovery, his clients were denied the opportunity to evaluate it or obtain an expert to rebut it. He also raised that it was not certified by a records custodian and also that it purported to be evidence of damages for a circumstance allegedly existing three years after this transaction occurred. N.T. 7/15/21, at 4. In response, Mr. Dudeck argued that the parties had stipulated to authenticity, that in arbitration cases, this document would be admissible, and reiterated that he gave Mr. Burns the document on the same date that he received it. N.T. 7/15/21, at 5-6.[13]

Thereafter, the Court ruled that the estimate would not be admitted. N.T. 7/15/21, at 7. The undersigned reasoned that insofar as the document is an estimate and not a paid invoice, its probative value would be outweighed by prejudice and also a risk of confusing/misleading the jury. Furthermore, the Court also noted that it was hearsay insofar as its contents were being offered for the truth of the matter asserted.

Moreover, although not stated on the record, the undersigned precluded admission of Exhibit D-16 based upon its untimely identification in violation of both the Agreed Case Management Order and the Pre-Trial Order. Mr. Dudeck stated during argument on this issue that "[e]veryone knew this panoramic was not working," and yet, his client did not obtain an estimate for its repair until July 4, 2021 – nine days before the start of trial. N.T. 7/15/21, at 5. The Agreed Case Management Order, however, required the identification and exchange of all exhibits no later than February 28, 2021. Mr. Dudeck offered no argument as to why his client was unable to obtain an estimate on or before that date. Similarly, he offered to reason as to why his client was unable

---

[13] The Court did not hear Mr. Burns further on the arguments made by Mr. Dudeck and/or his statement that the parties did agree to the authentication of Exhibit D-16 but does note that on day one of the trial, in the context of discussing agreements to exhibits, Mr. Burns did specifically mention that he objected to this document. N.T. 7/13/21, at 13.

44

to obtain an estimate prior to June 8, 2021, when Appellants filed their Pre-Trial Memorandum, which also required the parties to identify all exhibits to be introduced at trial or risk preclusion of evidence at trial. *See* Pre-Trial Order.

Based upon the foregoing, the undersigned was well within her discretion to preclude admission of Exhibit D-16 and/or any testimony thereon. Accordingly, the Court did not err in doing so.

I. **The Trial Court Did Not Err or Abuse its Discretion When it Granted and Did Not Remove Appellees' Motion for Compulsory Nonsuit as to Appellants' Counterclaim for Breach of the Asset Purchase Agreement**

Next, Appellants complain that the Court erred when it granted and did not remove Appellees' request for a compulsory nonsuit on Appellants' breach of contract counterclaim relating to the accounts receivable. It is well settled that entry of a compulsory nonsuit is proper where the factfinder, viewing all the evidence in favor of the plaintiff, could not reasonably conclude that the essential elements of a cause of action have been established. *See* Pa. R.C.P. No. 230.1.

In this case, Appellants' breach of contract counterclaim relating to the accounts receivable was based upon the premise that the parties' agreed that the term "aggregate amount" of accounts receivable meant the aggregate amount that is collectable. N.T. 7/13/21, at 33-34. Consequently, in order for the jury to find a breach, it first would have to find that the parties agreed that the term "aggregate amount" meant "aggregate amount that is collectable." As discussed above, however, in ruling on the Motion *in Limine* the Court concluded that the term "aggregate amount" was not ambiguous, meant that which is reflected by its plain language, and *did not* mean the aggregate amount that is collectible. N.T. 7/13/21, at 39-40. Additionally, based upon these findings, the Court ruled that Appellants were barred from introducing any evidence that would vary or explain

45

the parties' contract. Insofar as Appellants were barred from introducing any evidence that would permit them to introduce evidence of the very term of the APA which they contend was breached, the jury could never find a breach. Consequently, Appellants' breach of contract counterclaim relating to the accounts receivable failed as a matter of law. Accordingly, the Court properly granted Appellees' motion for compulsory nonsuit and properly denied Appellants' request to remove it.

**J.      The Trial Court Did Not Err or Abuse its Discretion When it Did Not Instruct the Jury on Appellants' Requested Points for Charge 1 and 3**

Next, Appellants complain that the Court committed error and/or abused its discretion when it refrained from instructing the jury on two of Appellants' requested points for charge.

First, Appellants contend that the undersigned should have instructed the jury as follows:

> A material breach of a contract relieves the non-breaching party from any continuing duty of performance thereunder. A party also may not insist upon performance of the contract when he himself is guilty of a material breach of the contract. *LJL Transportation, Inc. v. Pilot Air Freight Corp.*, 599 Pa. 546, 962 A.2d 639 (2007).

Defendants' Requested Point for Charge No. 1 – First Material Breach. Appellants also contend that the undersigned erred and/or abused her discretion when she failed to instruct the jury as follows:

> The duty of good faith and fair dealing is implied in every contract. *This implied duty of good faith and fair dealing applies only to discretionary obligations under the contract.* It does not create new obligations or obligations inconsistent with specific terms of the contract. *Duties or obligations are discretionary when a party has some degree of choice in how to perform its obligations under the contract.* A party should not do anything to destroy or injure the other party's right to receive the benefits of the contract. Therefore, even discretionary duties and obligations must be performed in a reasonable manner consistent with the contract's purposes.

Defendants' Requested Point for Charge No. 3 – Implied Duty of Good Faith and Fair Dealing (emphasis added).

46

It is well settled in Pennsylvania that a trial court is to charge only on the law for which there is some factual support in the record. *See e.g., Potochnick v. Perry*, 861 A.2d 277, 283 (Pa. Super. 2004) (holding that trial court's refusal to read certain proposed charges was proper and not a basis to grant a new trial). It is equally well established that a trial court may properly refuse to give a requested instruction containing even a correct statement of law where the court's charge "accurately reflects the law and is sufficient to guide the jury in its deliberations." *See id.* (citing *Cruz v. Northeastern Hosp.*, 801 A.2d 602, 611 (Pa. Super. 2002) (citation omitted)). In other words, a refusal to give an instruction containing a correct statement of the law will not be grounds for a new trial where the substance of that requested charge has otherwise been covered in the court's jury instructions. *See id.* (citation omitted).

With respect to Defendants' Requested Point for Charge No. 1, the record reflects that Appellants sought to have it read to the jury in the hopes that the jury would conclude that Appellees first materially breached the APA thereby relieving Appellants of their contractual obligations to make payments to Dr. Hoorfar under the APA and the Promissory Note. The timing element of this jury instruction, however, only is relevant if a party is seeking rescission of a contract as its remedy. Importantly, the law is clear that in a breach of contract action, the plaintiff either may rescind the contract and seek restitution **or** enforce the contract and recover damages based on expectation. *See Smith v. Brink*, 561 A.2d 1253, 1255 (Pa. Super. 1989) (emphasis in original). In this regard, the Doctrine of Election of Remedies prohibits a party from seeking inconsistent relief. *See Umbelina v. Adams*, 34 A.3d 151 (Pa. Super. 2011) (explaining that a party cannot maintain at one time in separate counts of one action or in two separate suits, claims for rescission/restitution on one hand and damages for breach of contract on the same contract, as these remedies are essentially inconsistent). In other words, one may

47

not terminate contractual obligations and seek the return of his or her consideration based upon the other party's promise through an action for rescission and restitution and at the same time seek the full benefits of that promise through an action for breach. *See id.*

In this case, it was clear from the parties' pleadings and the evidence introduced at trial that neither Appellants nor Appellees sought rescission of any of the agreements, but instead, sought monetary damages on their respective breach of contract claims. Thus, there was no factual support in the record to require the undersigned to charge the jury with Defendants' Requested Point for Charge No. 1. Accordingly, the Court did not err or abuse its discretion in refraining from doing so.

Similarly, there was no evidence introduced by either Appellants or Appellees of any discretionary obligation within the APA, Amendment to APA and/or Promissory Note and/or that any party had breached a discretionary obligation under any of those written agreements. Indeed, even with respect to the Appellants' counterclaim for breach of the APA regarding the accounts receivable, Ms. Gatsch conceded that the obligation on the part of Dr. Hoorfar was to produce a written accounts receivable aging report to her on the Closing Date and that he did in fact do so. N.T. 7/14/21, at 133-34. Thus, there was no factual support in the record to support Defendants' Requested Point for Charge No. 3. Accordingly, the Court did not err or abuse its discretion in declining to instruct the jury thereon. *See Potochnick*, 861 A.2d at 283.

K. **The Trial Court Did Not Err or Abuse its Discretion When it Did Not Enter Judgment Notwithstanding the Verdict in Favor of Appellants on Appellees' Claim for Breach of the Professional Services Agreement**

Appellants next contend that the Court abused its discretion when it did not enter JNOV on Appellees' claim that Appellants breached the PSA. Appellants contend that the Court erred when

48

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

it denied their post-trial motion seeking JNOV because the verdict was against the weight of the evidence.

With respect to claims implicating the weight of the evidence, there are two bases upon which a judgment n.o.v. can be entered: 1) the movant is entitled to judgment as a matter of law, and 2) the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *See Rohm & Haas Co. v. Continental Cas. Co.*, 781 A.2d 1172, 1176 (Pa. 2001) (citations omitted); *see also Haan v. Wells*, 103 A.3d 60, 69 (Pa. Super. 2014). It is equally well settled that a trial court may award a judgment notwithstanding the verdict "only when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice." *Haan*, 103 A.3d at 70; *see also Green v. Johnson*, 227 A.2d 644, 644-45 (Pa. 1967) (explaining that a fact finder's verdict is shocking when it is so opposed to the demonstrative facts that looking at the verdict, the mind stands baffled, the intellect searches in vain for cause and effect, and reason rebels against the bizarre and erratic conclusion). It is also well established that a JNOV should not be entered where the evidence is conflicting on a material fact. *See id.*; *see also Rohm*, 781 A.2d at 1176 (explaining that when the jury is presented with conflicting evidence, JNOV should be denied). Instead, the grant of a judgment notwithstanding the verdict should only be entered in a clear case. *See e.g., Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932 (Pa. Super. 2013) (holding that trial court did not err in denying JNOV where sufficient evidence existed to support jury's verdict).

In this case, the jury's verdict was not shocking because there was more than sufficient evidence to support it. Indeed, much of the evidence introduced by Appellees in support of this claim was not even disputed. For example, both parties introduced evidence of the existence the contract between them which is the subject of this claim. Indeed, Appellants and Appellees each

49

separately marked and moved the PSA into evidence. *See* Exhibit P-6 and Exhibit D-3. Similarly, both Appellants and Appellees introduced evidence that Dr. Hoorfar was to be compensated for providing dental services to RG Dental after the Closing Date and that he did in fact provide such services until mid-December 2018. *See* N.T. 7/15/21, at 25-30; *see also* N.T. 7/13/21, at 142-143. Dr. Hoorfar and Ms. Gatsch also both testified as to the formula to be used to calculate the compensation to be paid to Dr. Hoorfar under the PSA. *See* N.T. 7/14/21, at 68-70; *see also* N.T. 7/15/21, at 25-28, 67-68. In fact, it was undisputed at trial that Dr. Hoorfar's compensation for such dental services was to be calculated consistent with the formula set forth in Exhibit E attached to Exhibit P-6 and Exhibit D-3; that is, "40 percent of gross collection receipts less 40 percent of lab." Exhibit E also defined the term "lab." That definition set forth various lab charges that might apply to certain dental work including but not limited to, dentures, implants, mouth guard fabrications, TMJ appliance. The parties also did not dispute that at some point Appellants stopped paying Dr. Hoorfar for the work performed by him. Dr. Hoorfar testified that they stopped paying him under the PSA and that he has not been paid since some time in November 2018. N.T. 7/13/21, at 145-46. Ms. Gatsch conceded that at some point she applied what she identified as "credits" and "adjustments" and also withheld monies from his payroll. N.T. 7/15/21, at 27-29.

Indeed, the only real dispute at trial on this particular breach of contract claim related to *the amount* of compensation still owed to Dr. Hoorfar. N.T. 7/14/21, at 78-80. Dr. Hoorfar testified he calculated that amount to be $10,360.50 and Ms. Gatsch testified that after various adjustments and reductions were made by her as set offs, this figure came to $763.89. N.T. 7/15/21, at 29-30.

In support of his claim for an award of damages in the amount of $10,360.50, Dr. Hoorfar testified that he was entitled to 40 percent of net collections and that he was able to access

50

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

information using his software to show him what that figure would be for which he was not paid. N.T. 7/13/21, at 147. After Exhibit P-11 was marked for identification, Dr. Hoorfar testified that Exhibit P-11 was an aging report that he ran for the work he had done after the Closing Date. N.T. 7/13/21, at 148-49. Exhibit P-11 was then moved and admitted into evidence. Dr. Hoorfar was then asked to review Exhibit P-11 and tell the jury the amount he claimed was still owed to him under the PSA. Notably, on both direct examination and on cross-examination, Dr. Hoorfar made clear that the formula *gross* collection less 40 percent of labs as set forth in Exhibit E is the same as 40 percent of net collections. Indeed, on cross-examination Dr. Hoorfar explained the formula as follows: "Essentially it's 40 percent of your *net collection.* So whatever your collection is, say you collect $20,000, you are entitled to 40 percent of that. And the net collection meaning is that if you incurred any lab bills during the time while the work was done, that labs would also be figured at 40 percent so you are getting a net collection." N.T. 7/14/21, at 68. When Mr. Dudeck then identified the formula in terms of *gross* collection less 40 percent of labs as set forth in Exhibit E, Dr. Hoorfar stated as follows: "I think that's what I just said." N.T. 7/14/21, at 69 (emphasis added).[14] Dr. Hoorfar identified the figure owed to him under this formula as $10, 360.50. N.T. 7/13/21, at 152.

During her direct examination, Ms. Gatsch presented her own report on which she made handwritten calculations of what she contended remained due and owing to Dr. Hoorfar under the PSA. N.T. 7/15/21, at 25-28. That "day sheet report," as she referred to it, was marked for identification purposes as Exhibit D-12 and moved into evidence without objection. *See* Exhibit D-12. Ms. Gatsch testified that Exhibit D-12 showed the total collections that were brought in for

---

[14] Ms. Gatsch also explained in her testimony that another way of saying gross collections less 40 percent of labs is to say net collections – meaning the labs were already taken into consideration. N.T. 7/14/21, at 109-10.

51

Dr. Hoorfar's services for the period July 31, 2018, to December 18, 2018. N.T. 7/15/21, at 26. Ms. Gatsch then testified as to her calculations of what she contended remain due and owing to Dr. Hoorfar for services provided by him under the PSA. Dr. Gatsch made reference to "applied credits" and "adjustments" but gave no clear explanation as to what those terms referred to, the source thereof, and/or how they related to Ms. Gatsch's calculation that 40 percent of the gross collections for work done by Dr. Hoorfar. She testified only that she took the category identified on the report as "Applied Payments," which itself is not completely readable, and multiplied it by 40 percent to come to $11,520.64. She then testified that she reduced that number by $1,961.20 which she identified as "40 percent lab fee" and came to a figure of $8,355.80. N.T. 7/15/21, at 28; *see also* Exhibit D-12. Again, however, Ms. Gatsch did <u>not</u> identify the source of information for this $1,961.20 in lab fees. Ms. Gatsch then took the $8,355.80 she came to and identified as the "net pay" and further reduced it by amounts she testified she believed she had a right to withhold based upon Appellants' claims against Appellees. N.T. 7/15/21, at 28-29; *see also* Exhibit D-11. Ultimately, she came to a figure of $763.89. N.T. 7/15/21, at 29.

Based upon the foregoing, there was nothing about the jury's verdict that was so opposed to the demonstrative facts to baffle the mind. *See Green*, 227 A.2d at 644-45. Indeed, Appellants and Appellees agreed there was a contract, a breach thereof, and also that Dr. Hoorfar was entitled to some amount in damages. Based upon Dr. Hoorfar's testimony, there was nothing shocking about the jury's verdict and award of $10,360.00 in damages. This is the figure he testified he calculated based upon the software available to him and the formula to which the parties agreed. While it is true that Ms. Gatsch offered conflicting evidence, the jury had every right to disregard it as not credible and to credit Dr. Hoorfar's testimony. Accordingly, the Court did not err or abuse its discretion when it chose not to grant Appellants' request for JNOV.

52

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

**L.** **The Trial Court Did Not Err or Abuse its Discretion When it Did Not Enter Judgment Notwithstanding the Verdict on Appellants' Counterclaim Regarding the Sale of the Office Equipment**

Next, Appellants complain that the Court erred and/or committed an abuse of discretion when it did not enter judgment NOV on Appellants' counterclaim regarding the sale of Hoorfar Dental's office equipment and supplies. Specifically, Appellants contend that the jury's verdict on this counterclaim was against the weight of the evidence and the undersigned should have entered judgment in favor of Appellants and against Appellees in the amount of $11,500.00. Concise Statement at 2.

At trial, Appellants sought to prove that Appellees breached ¶¶ 7.13 and 7.20 of the APA with respect to the supplies and equipment purchased by Appellants. In support of this claim, Appellants moved the APA into evidence as Exhibit D-1 and Exhibit D-1 was admitted without objection. Ms. Gatsch testified that Exhibit A to Exhibit D-1 was an inventory list of all the assets included in the sale of the dental practice other than the Practice Accounts Receivable. N.T. 7/14/21, at 101; *see also* Exhibit D-1, Exhibit B. Ms. Gatsch testified that pursuant to the APA, Appellants were purchasing "all of the assets of the practice including the furniture, the equipment, the patients, the computers, the x-ray unit. And from my understanding the account receivables over 90 days." N.T. 7/14/21, at 103.

Ms. Gatsch further testified on direct examination that as to the warranties set forth in ¶¶ 7.13 and 7.20 of the APA which state as follows:

> The Practice Assets, whether owned or leased by Seller, (i) are in good operating condition and repair, subject to normal wear and maintenance, (ii) are useable in the regular and ordinary course of business, (iii) conform to all applicable laws, ordinances, codes, rules and regulations, and (iv) are in compliance with all required consents, approvals and authorizations ("Authorizations") relating to their use and operation, including, but not limited to any environmental regulations . . . .

53

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

APA, ¶ 7.13.

> No representation or warranty by Seller in this Agreement nor any certificate, schedule, statement, exhibit, agreement, document or instrument furnished or to be furnished to Purchaser pursuant thereto, or in connection with the negotiation, execution or performance of this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make any statement herein or therein not misleading.

APA, ¶ 7.20. Ms. Gatsch then testified as to certain "issues" she had with pieces of equipment after the Closing Date. First, Ms. Gatsch testified that they had issues with the panoramic x-ray. N.T. 7/14/21, at 183. She explained that there are three motors that operate the machine and she learned that two of the motors needed to be replaced. N.T. 7/14/21, at 183-84. She testified that one of the motors was replaced and Dr. Hoorfar did pay for that motor. She further testified that the second motor is no longer available as the unit is so old and they don't make parts for it anymore. N.T. 7/14/21, at 184. She testified that in order to have a working panoramic x-ray machine, she would need to replace the existing one. N.T. 7/14/21, at 184-85.

With respect to other equipment, Ms. Gatsch testified that there also were issues with an x-ray machine in treatment room 3. N.T. 7/14/21, at 185. She testified that "[t]he unit itself was old but there were issues initially with the trigger or the button to be able to capture the image outside of the room." N.T. 7/14/21, at 185. She testified that because the unit was "so old" it was not easily repairable and "not easy to get parts," so she replaced it with a portable x-ray camera "rather than replacing the antiquated x-ray units." N.T. 7/14/21, at 184-86. Ms. Gatsch also testified that she started having problems with the handpieces (high speed drills) soon after the Closing Date. N.T. 7/14/21, at 187.

54

Thereafter, Mr. Dudeck marked a series of invoices from Henry Schein collectively as Exhibit D-15. Ultimately, D-15 was admitted for the limited purpose of permitting Appellants to attempt to prove damages.[15]

Ms. Gatsch then testified that she had to pay $459.76 to fix a dental chair she had purchased from RG Dental. Ms. Gatsch conceded that the chair was still under warranty so the $459.76. represented labor only. N.T. 7/14/21, at 195-96. Ms. Gatsch then testified to an invoice for $2,177.18 which she explained was for handpieces. N.T. 7/14/21, at 198. Ms. Gatsch did not testify as to when she purchased these handpieces but the invoice reflects a date of December 17, 2018. *See* Exhibit D-15.

Ms. Gatsch then testified regarding the topic of supplies. She testified that the supplies in the office did not meet her expectations represented in the APA. N.T. 7/14/21, at 201-02. She testified that she had to purchase dental supplies on August 3 and August 6, 2018 which cost her $2,131.93. Ms. Gatsch testified that she purchased dental materials for $155.00 on or about August 3, 2018. She further stated that she purchased additional dental supplies for $54.00 and paid $27.00 for needles for the syringes. N.T. 7/14/21, at 204-06. Ms. Gatsch testified that she ordered more dental supplies on August 27, 2018, and paid $314.26 for those supplies. Ms. Gatsch also testified that she had to pay $599.99 for an emergency kit that she contended was required by law because the kit she purchased as part of the sale had expired. N.T. 7/14/21, at 206-07. Finally, Ms. Gatsch

---

[15] Mr. Burns did not object to the authenticity of Exhibit D-15 but did object to its admission. Mr. Burns first objected to the admission of any invoices to the extent that the repairs referenced therein had not been made but agreed to the admission of the documents for the limited purpose of proving damages. N.T. 7/14/21, at 192. The Court then admitted Exhibit D-15 but only for the limited purpose of calculating damages, if in fact, the jury found a breach and damages. N.T. 7/14/21, at 193. After Mr. Dudeck began questioning Ms. Gatsch on Exhibit D-15, he realized that one of the "invoices" was actually a quote for work that was never performed. The parties agreed that Exhibit D-15 would be modified such that that estimate would be removed. The parties similarly agreed that a statement (not invoice) was also be removed from Exhibit D-15. N.T. 7/14/21, at 196-98.

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents. E-Filed by: Daniele Faino

testified that she paid $588.91 in labor to replace a motor for the panoramic. She testified that this was not the motor purchased by Dr. Hoorfar and that she had purchased this motor from a different representative. The $588.91 represented the labor for this motor. N.T. 7/14/21, at 207-08.

Ms. Gatsch also testified as to an invoice she paid for installation of an amalgam separator, a repair kit for the vacuum pump, a repair kit for the air compressor and five handpieces. The invoice was marked as Exhibit D-17 and admitted into evidence. Ms. Gatsch testified that she paid $1,543.00 for the items referenced in Exhibit D-17. Ms. Gatsch did not testify as to when these repairs were made, and Exhibit D-17 does not have a date on it. Ms. Gatsch testified to another invoice from Dental Fix which was marked as Exhibit D-18 and admitted into evidence. Ms. Gatsch testified that Exhibit D-18 related to repairs that were made in March of 2019. She testified that the invoice is for $290.76, and she paid that amount to Dental Fix. N.T. 7/15/21, at 23-24.

On direct and cross-examination, Ms. Gatsch conceded that the equipment was sold in "as is" condition. N.T. 7/14/21, at 114; N.T. 7/15/21, at 47. Ms. Gatsch also testified that attached to the APA was an exhibit setting forth a list of the equipment to be sold and she would have been able to inspect the equipment prior to the Closing Date. N.T. 7/15/21, at 70. Ms. Gatsch further conceded that the dental chair that had to be fixed was relatively new and still under warranty. N.T. 7/15/21, at 64. Ms. Gatsch also admitted that the first time she raised any issues with Dr. Hoorfar about the equipment (other than the panoramic x-ray for which she agrees he covered the new motor) was in November 2018, months after the Closing Date. N.T. 7/15/21, at 64-65. Ms. Gatsch also conceded that she sought to recover for some repairs that were not required until many months after the Closing Date. N.T. 7/15/21, at 72-75. She further acknowledged that some of

56

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

the equipment she bought was old and would eventually need to be replaced. N.T. 7/15/21, at 77-78.

With respect to supplies, Ms. Gatsch agreed that the APA provided that the supplies were going to be based upon the normal inventory of the seller. N.T. 7/15/21, at 68. Ms. Gatsch conceded that she did not know what constituted Dr. Hoorfar's "normal inventory." N.T. 7/15/21, at 68-69.

During his testimony on this topic of equipment and supplies, Dr. Hoorfar testified that he sold the equipment on as "as is" basis and understood the "As-Is" paragraph of the APA to mean "whatever you get that day is what you get that day" subject to the representations that the equipment was in good working order. N.T. 7/15/21, at 107-08. He further testified that he believed the equipment he sold was in good working order as of the Closing Date with the exception of the panoramic. He testified that the panoramic was an old piece of equipment and he believed Ms. Gatsch's expectations about it were unreasonable.[16] He testified, however, that he did pay for repairs for that piece of equipment. N.T. 7/15/21, at 108-10. He also testified that there was an issue with the trigger on the x-ray arm and he paid to fix that as well. N.T. 7/15/21, at 108-10. Dr. Hoorfar also testified that otherwise, "[n]obody was telling me things weren't working." He was providing dental services at the new practice and "everything was working." N.T. 7/15/21, at 108. According to Dr. Hoorfar, these issues with the equipment were only brought to his attention around the same time he was going to discontinue providing dental services. N.T. 7/15/21, at 110-11.

---

[16] Notably, she described this equipment on direct examination as "antiquated." N.T. 7/14/21, at 186.

57

With respect to handpieces specifically, Dr. Hoorfar testified that rather than spend $1,000.00 on a single German handpiece, it was his practice to purchase ten "decent" handpieces and replace them after three months. N.T. 7/15/21, at 111. He also testified that when he was advised that RG Dental had some issues with handpieces, he did purchase ten handpieces for them. N.T. 7/15/21, at 111-12.

As to supplies, Dr. Hoorfar was asked about his understanding of the provision relating thereto in the APA. Dr. Hoorfar testified that he understood his obligation to mean "whatever the office operations manager was doing which is keep the office supplied as they needed it." N.T. 7/15/21, at 112-13. He also testified that as of the Closing Date he was not aware of any supply shortages, and no one raised any issue of shortages with him. N.T. 7/15/21, at 113.

Again, in light of the foregoing evidence, there was nothing shocking or inherently unreasonable about the jury's verdict in favor of Appellees on this counterclaim. There was more than sufficient evidence introduced demonstrating that Dr. Hoorfar sold the equipment in a good working condition, and, to the extent he did not, he paid for those repairs. There was also more than sufficient evidence for a jury to reasonably conclude that Appellants' complaints of additional problems were not timely raised and/or were the result of a breakdown in the relationship and not the equipment itself.

As for the supplies, Ms. Gatsch could not even testify as to what the normal inventory of Hoorfar Dental looked like, and again, Dr. Hoorfar testified that up until the Closing Date he maintained operations and supplies in the same manner as he normally would in operating the practice himself. The jury had the right to credit his testimony over that of Ms. Gatsch. *See Haan*, 103 A.3d at 72 (explaining that "a fact-finder is permitted to accept all, part, or none of the testimony, and it is within the fact-finder's exclusive province to resolve conflicts in that

58

testimony"). In light of the record, the jury's verdict on this particular claim cannot be said to be shocking. Accordingly, the Court did not err or abuse its discretion when it chose not to grant Appellants' request for JNOV and enter a specific award in their favor for $11,500.00.

**M. The Trial Court Did Not Err or Abuse its Discretion When it Did Not Enter Judgment Notwithstanding the Verdict on Appellants' Counterclaim Regarding Dr. Teitelman's Bonus**

Appellants similarly complain that the Court erred and/or abused its discretion when it denied Appellants' request for judgment NOV on Appellants' breach of contract counterclaim relating to Dr. Teitelman's bonus. Appellants contend that the jury's verdict with respect to that counterclaim also was against the weight of the evidence.

At trial, Appellants sought to prove that Appellees breached ¶¶ 7.19 and 16.1 of the APA by failing to pay RG Dental's former employee, Dr. Teitelman, a bonus for services Appellants contended were provided to Hoorfar Dental prior to the Closing Date. In support of this claim, Appellants introduced into evidence two documents relating to the employment of Dr. Teitelman. The first, marked as Exhibit D-4, was the Assignment for Employment Agreement ("Assignment Agreement") and the second, marked Exhibit D-5, was the Employment Agreement for Dr. Teitelman ("Employment Agreement"). Both Exhibits D-4 and D-5 were admitted into evidence without objection. The PSA had already been admitted into evidence. *See* Exhibits P-2 and D-11.

In addition, Ms. Gatsch explained that after the Closing Date, Dr. Teitelman, a former employee of Hoorfar Dental, began to work for RG Dental pursuant to the Assignment Agreement and the Employment Agreement. Ms. Gatsch testified that in August 2018, Dr. Teitelman came to her and asked for a bonus payment. N.T. 7/14/21, at 164-65. Ms. Gatsch did not specify when in August Dr. Teitelman made this request. Ms. Gatsch testified that under the Employment Agreement, Dr. Teitelman was to receive 30 percent of her net collections and that was the bonus

59

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

she sought from Ms. Gatsch. N.T. 7/14/21, at 165. Ms. Gatsch testified that she believed that RG Dental was only responsible to pay Dr. Teitelman for services rendered after July 31, 2018, the Closing Date. N.T. 7/14/21, at 167. Ms. Gatsch testified that Dr. Teitelman was seeking a bonus for services provided by her prior to the Closing Date. Ms. Gatsch testified that she believed Hoorfar Dental was responsible for such bonus based upon ¶ 7.19 of the APA. N.T. 7/14/21, at 167-68.[17] Ms. Gatsch testified that she told Dr. Teitelman to take up her request for a bonus with Dr. Hoorfar, but eventually decided to pay her "as she was my employee and I didn't want a disgruntled employee thinking I owed her money." N.T. 7/14/21, at 168.

Subsequent to this testimony, Mr. Dudeck marked a document as Exhibit D-11 and asked Ms. Gatsch to identify the document. Ms. Gatsch identified Exhibit D-11 as documents generated from her ADP payroll software which she used to calculate the bonus which she testified she paid Ms. Gatsch. Exhibit D-11 was admitted into evidence without objection. Ms. Gatsch then testified to the amount of the total bonuses she paid Dr. Teitelman *including* for services rendered *after July 31, 2018.* N.T. 7/14/21, at 172-74. Ms. Gatsch calculated that amount to be $28,214.97. N.T. 7/14/21, at 173. Notably, Ms. Gatsch was unable to identify the amount of the bonus that was paid to Ms. Teitelman for services provided *before July 31, 2018* until after counsel for Appellants refreshed Ms. Gatsch's recollection. Upon having her recollection refreshed with

---

[17] Paragraph 7.19 of the APA states as follows:

> Seller shall have sole and exclusive responsibility for any duties and obligations owed to its employees, including any and all vacations, bonus, and other benefits which have accrued prior the Closing Date. Purchaser is not assuming any such obligations.

APA, ¶ 7.19.

60

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.
E-Filed by: Daniele Faino

Exhibit D-10 (not admitted), Ms. Gatsch testified that the bonus she paid for work performed by Dr. Teitelman prior to July 31, 2018 was $19,775.91. N.T. 7/14/21, at 180-81.

On cross-examination, Mr. Burns reviewed the Assignment Agreement with Ms. Gatsch and Ms. Gatsch conceded that the Employment Agreement was assigned to RG Dental and Dr. Teitelman became an employee of RG Dental Group as of July 31, 2018. N.T. 7/15/21, at 51-52. Ms. Gatsch agreed on cross-examination that she understood the Employment Agreement to mean that after the Closing Date, RG Dental was responsible to pay Ms. Teitelman her salary, commission, and bonus. N.T. 7/15/21, at 55, 58-59. She also conceded that any receivables that came in for work performed by Dr. Teitelman before July 31, 2018 were being collected by RG Dental. N.T. 7/15/21, at 56.

In defense of this claim, Dr. Hoorfar also testified. Notably, he testified that he did, in fact, pay a bonus owed to Dr. Teitelman. N.T. 7/15/21, at 102. Dr. Hoorfar testified that the calculation of the bonus is done on a monthly basis, and he explained how Dr. Teitelman's bonus was calculated each month under the Employment Agreement. N.T. 7/15/21, at 100-03. He further testified that such bonus is then typically paid in the next paycheck. N.T. 7/15/21, at 101-03. Dr. Hoorfar acknowledged that Hoorfar Dental had an obligation to pay Dr. Teitelman's bonus for July 2018. He testified that he waited until all the July 2018 money was in, did the calculation of her bonus, and then paid her. N.T. 7/15/21, at 102. He testified that he paid her in full for his obligations to her including any bonus. N.T. 7/15/21, at 102-04.

Based upon this evidentiary record, the jury's verdict in favor of Dr. Hoorfar on this counterclaim cannot be said to be shocking. There was clearly an evidentiary discrepancy as to whether Dr. Hoorfar paid to Dr. Teitelman a bonus for work performed prior to July 31, 2018. As factfinder, however, it was within the province of the jury to decide whether to credit Ms. Gatsch's

61

testimony or Dr. Hoorfar's testimony on this subject. *See Haan*, 103 A.3d at 71 (explaining that "[t]he factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses").[18] The jury clearly chose to accept Dr. Hoorfar's testimony that he paid Ms. Teitelman her bonus for work performed prior to July 2018. There was certainly sufficient evidence in the record to support this. According, the Court did not err or abuse its discretion when it chose not to grant Appellants' request for JNOV.

## V. CONCLUSION:

For all of the foregoing reasons, the undersigned respectfully submits that this appeal be **DISMISSED**.

BY THE COURT:

DATE: 3-9-22

_____
DENISE M. BOWMAN, J.

N.B. It is your responsibility to notify all interested parties of the above action.

---

[18] Notably absent to testify in support of this counterclaim was Dr. Teitelman herself. Also, Dr. Rakawsky did not testify or, for that matter, even attend the trial.

Case# 2019-00657-80 - JUDGE:42 Received at County of Bucks Prothonotary on 03/09/2022 2:08 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents. E-Filed by: Daniele Faino